# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-DP-01877-SCT

*TIMOTHY NELSON EVANS a/k/a TIMOTHY N.*
*EVANS a/k/a TIMOTHY EVANS a/k/a TIM EVANS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/23/2013 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | TODD NATHAN THRIFFILEY |
| | MATTHEW DRAKE BURRELL |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | FRANK P. WITTMANN, IV |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CAMERON LEIGH BENTON |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 06/15/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Timothy Nelson Evans was tried and convicted of capital murder with the underlying felony of robbery for the killing of Wenda Holling. At the conclusion of the sentencing phase, the jury imposed the death penalty. The Circuit Court of Hancock County denied Evans's post-trial motions. Evans appeals, raising ten assignments of error. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Evidence adduced at trial revealed that in the spring of 2009, Evans moved into Holling's home as her tenant. The two previously had been romantically involved, but that relationship had ceased before Evans moved in with seventy-year-old Holling. On the morning of January 2, 2010, fifty-two-year-old Evans and his friend, Joe Thomas, were on the way to perform a carpet-cleaning job when the van they were riding in broke down. Evans had consumed several beers that morning and asked Thomas for money to buy more beer, which Thomas did not give him. Evans called Holling and asked her to pick him up. After the call, Evans told Thomas that Holling was going on a cruise with her daughter and he had to drive her to the airport in Baton Rouge. Holling picked up Evans in her silver Kia and drove him to her house. When Evans left with Holling, he was intoxicated.

¶3.     Once home, Holling was sitting in a chair in the living room when Evans attempted to smother her with a pillow. When his attempt to smother Holling failed, Evans strangled her to death. Then, Evans placed her body on her bed, showered, and got ready to go out. Evans took Holling's credit card and, at about 5:00 p.m., picked up Thomas in Holling's Kia, announcing "come on, let's go party." Evans had been drinking when he picked up Thomas. Evans and Thomas stopped at several ATMs where Evans used Holling's credit card to obtain cash. Then, the two traveled to Sawdoff's bar, where Evans used cash and Holling's credit card to pay for alcohol and food for himself and Thomas. Later, Evans dropped off Thomas and returned to Holling's home.

¶4. The next morning, Evans placed Holling's body in the trunk of her Kia, picked up Thomas, and drove to Harrison County. While driving, he told Thomas he had run over a skunk and asked several times if Thomas could smell it. He dropped Thomas off and then stopped at Pee-Wee's gas station, where he bought beer with cash, but he used Holling's credit card to buy gas. Evans then drove to a rural area where he dumped Holling's body in the woods about ten yards from the side of the road. The same day, Evans attempted to use Holling's credit card again at a Walmart in Wiggins, but it was declined.

¶5. Holling's adult children, who usually spoke with their mother regularly, became concerned about her whereabouts. On January 5, 2010, Holling's son called the Hancock County Sheriff's Department and reported her missing. Investigator John Luther detected no signs of a struggle inside Holling's home. He found several items of clothing and a pair of prescription glasses, all identified as Holling's, in a garbage can outside Holling's home. Evans gave a voluntary statement to Investigator Luther, not admitted at trial, in which he said that Holling had gone to Florida on vacation. Investigator Luther subpoenaed records from Holling's bank and determined that her credit card had been used at several locations on January 2 and 3, 2010. He obtained surveillance video and purchase records from Pee-Wee's gas station that showed Evans had used the credit card to buy gas. On January 26, 2010, Holling's body was discovered by a road crew in Harrison County. Dr. Paul McGarry performed an autopsy that revealed defensive wounds and the cause of death, manual strangulation.

¶6.    Investigator Luther requested the assistance of the United States Marshals Service to locate Evans. On February 17, 2010, the Service apprehended Evans in a hotel room in Florida. Evans waived extradition and gave a statement to local investigators admitting that he had killed Holling; this statement also was not admitted at trial. The next day, Evans was transported back to Hancock County, where he gave an audiorecorded statement that was admitted. In that statement, Evans revealed that, after Holling had driven him home that afternoon, he had decided to steal her credit card from her purse, but she had caught him in the act. He and Holling began arguing, and he decided to kill Holling. As Holling was sitting in her living room chair, he "went and got a pillow and put it over her head . . . when that didn't work . . . I just strangled her and uh then I just picked her up and I put her up on her bed and I got the credit card and I took a shower and I just went out like everything was fine . . . ."

¶7.    Evans also described how the next morning, before he transported Holling's body to Harrison County, he removed several items of Holling's clothing and placed them in the trash can outside. He said that, after he had deposited Holling's body in the woods, he threw her purse into some weeds farther down the road. Then he drove to Bogue Chitto and stayed with a friend. Evans also described how he had disposed of Holling's cell phone by throwing the phone's chip down a drain in Picayune and throwing the phone itself out of the car window beside an interstate exit.

¶8.    Evans brought investigators to the area where Holling's body was found. He also showed them the area where he had thrown her purse, but it was never found. On March 10,

4

2010, Evans wrote a letter to Investigator Luther which amended his earlier statement. In the letter, Evans said that he had decided to "use [Holling's] credit card and cash I knew she had in [her]bedroom drawer," and then he attempted to smother her with a pillow; when that failed to kill her, he got on top of her and strangled her to death. Evans said that his previous statement that Holling had caught him taking her credit card had been a lie. He wrote: "I planned this that day and I know that I just followed thru [sic] with plan." (Emphasis in original.) Evans wrote that "I had to confess truthfully to God and also to you for me to be forgiven by God, I don't expect man to forgive me. . . ."

¶9. In June 2010, Evans wrote a five-page letter to Donna Harris, a reporter with *The Sun Herald*. In this letter, Evans stated that he had planned the killing on December 20, 2009. He decided where and how to kill Holling, and "planned party time too." Evans wrote that, on December 29, 2009, he looked for a place to bury the body. Evans said that, after he "carried out murder on January 2nd 2010," he "went out partying Saturday nite [sic]. . . ." He said that he "used her credit card too." Evans described how he used the credit card and said that he "meant to go back to place and bury body." However, before he could do so, he left the state to evade capture. Evans's letters to Luther and Harris were admitted at trial.

¶10. Defense counsel emphasized Evans's intoxication and attempted to show that Evans was guilty of, at most, heat-of-passion manslaughter. The defense presented no testimony but did offer the newspaper article that Donna Harris had written after her interview with Evans. Harris wrote that, during the interview, Evans had expressed remorse and said that he deserved to go to death row, did not deserve the mercy of the court, and "[i]f he could, he

5

would plead guilty today and get a death sentence." Evans also had said that he had been drinking heavily the day of the killing, and "I just lost control of my thoughts. I just lost control of what I was doing and what I was thinking." He admitted that, when Holling was still breathing, he had second thoughts but decided to follow through on his plan.

¶11.   The trial court denied Evans's proffered manslaughter instructions, finding them unsupported by the evidence. The jury found Evans guilty of capital murder. At the sentencing phase, the State reintroduced all evidence from the guilt phase and then rested.

¶12.   Evans then presented the testimony of a clinical and forensic psychologist, Dr. R.M. Storer, and a clinical and medical psychologist, Dr. Marc Zimmerman. Dr. Storer had performed a pretrial evaluation to (1) examine Evans's mental state at the time of the alleged offense, (2) determine his competency to stand trial, (3) evaluate whether he suffered from intellectual disability, and (4) provide any mitigating circumstances related to the alleged offense. Dr. Storer testified that his testing showed that Evans had a full-scale IQ of 87, in the nineteenth percentile, and that he was not intellectually disabled. Based on his interview of Evans, Dr. Storer opined that Evans had experienced a troubled childhood in which his parents had divorced and his mother had been emotionally abusive. Evans began abusing alcohol and drugs at an early age. Dr. Storer testified that Evans had a criminal history that was related to his abuse of alcohol and drugs. He diagnosed Evans with alcohol dependence, abuse of other substances, and conversion disorder which, he explained, is when "people have a lot of anxiety and . . . that anxiety comes out through physical symptoms." He testified that, based on his interview with Evans, he might have been under extreme mental and

6

emotional disturbance at the time of the offense. However, Dr. Storer emphasized that he had been unable to corroborate any of the information Evans had provided. He concluded that, at the time of the crime, Evans had not been "suffering from a mental disease or defect that would have prevented him from knowing the nature and quality of his alleged acts or from knowing the difference between right and wrong . . . ."

¶13. Dr. Zimmerman testified that he had performed a mental evaluation of Evans for mitigation purposes. Dr. Zimmerman concluded that Evans either was abusing alcohol and drugs or he was addicted to them. He also detected a cognitive disorder and some form of anxiety disorder, possibly post-traumatic stress disorder, but he testified that further testing would be needed for a conclusive determination. He opined that, due to Evans's anxiety and chemical dependence, he had been suffering from extreme emotional disturbance at the time of the crime. Like Dr. Storer, Dr. Zimmerman was unable to corroborate any of Evans's assertions about his history.

¶14. The jury found beyond a reasonable doubt that Evans actually had killed Holling. The jury found the single aggravating circumstance on which it had been instructed—that the capital offense had been committed for pecuniary gain during the course of a robbery—beyond a reasonable doubt. Finding that insufficient mitigating circumstances existed to outweigh the aggravating circumstance, the jury found Evans should receive the death penalty. Evans filed a post-trial motion for a judgment notwithstanding the verdict (JNOV) or a new trial. After a hearing, the motion was denied. Evans appealed.

## ISSUES

7

¶15. On appeal, Evans raises the following ten issues, *verbatim ad literatim*:

I. WHETHER, HAVING EXPRESSLY ORDERED EVANS EVALUATED FOR COMPETENCY, THE TRIAL COURT REVERSIBLY ERRED BY FAILING TO HEAR AND ADJUDICATE THE QUESTION OF EVANS'S COMPETENCY.

II. WHETHER THE JURY SELECTION PROCESS WAS CONSTITUTIONALLY INFIRM AND REQUIRES REVERSAL OF EVANS'S CONVICTION AND SENTENCE OF DEATH.

III. WHETHER ISSUES WITH THE JURY, EXACERBATED BY ITS APPARENT INABILITY TO FOLLOW JUDICIAL INSTRUCTIONS, ALSO INFECTED THE TRIAL ITSELF WITH REVERSIBLE ERROR.

IV. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE EVIDENTIARY ERROR AT BOTH PHASES OF THE PROCEEDINGS.

V. WHETHER EVANS'S CONVICTION AND SENTENCE MUST BE REVERSED BECAUSE OF THE PROSECUTOR'S MISCONDUCT IN MAKING CONSTITUTIONALLY IMPROPER AND PREJUDICIALLY INFLAMMATORY CLOSING ARGUMENTS.

VI. WHETHER THE TRIAL COURT DEPRIVED EVANS OF HIS CONSTITUTIONAL RIGHTS AT THE CULPABILITY PHASE OF THE TRIAL BY REFUSING HIS REQUESTED MANSLAUGHTER INSTRUCTIONS AND GRANTING THE STATE'S REQUESTED INSTRUCTIONS ON "ONE CONTINUOUS TRANSACTION" AND VOLUNTARY INTOXICATION.

VII. WHETHER THE TRIAL COURT'S ERRONEOUS SENTENCING PHASE INSTRUCTIONS REQUIRE VACATION OF THE DEATH SENTENCE AND REMAND FOR A NEW SENTENCING HEARING.

VIII. WHETHER THE DEATH SENTENCE WAS IMPOSED IN VIOLATION OF THE UNITED STATES CONSTITUTION.

IX.   WHETHER THE DEATH SENTENCE IN THIS MATTER IS CONSTITUTIONALLY AND STATUTORILY DISPROPORTIONATE.

X.    WHETHER THE CUMULATIVE EFFECT OF THE ERRORS IN THE TRIAL COURT MANDATES REVERSAL OF THE VERDICT OF GUILT AND/OR THE SENTENCE OF DEATH ENTERED PURSUANT TO IT.

## STANDARD OF REVIEW

¶16.   We apply heightened scrutiny to an appeal from a sentence of death. *Corrothers v. State*, 148 So. 3d 278, 293 (Miss. 2014). "This higher level of scrutiny requires that all doubts be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Bennett v. State*, 933 So. 2d 930, 939 (Miss. 2006) (quoting *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992)).

## ANALYSIS

I.    WHETHER, HAVING EXPRESSLY ORDERED EVANS EVALUATED FOR COMPETENCY, THE TRIAL COURT REVERSIBLY ERRED BY FAILING TO HEAR AND ADJUDICATE THE QUESTION OF EVANS'S COMPETENCY.

¶17.   Evans was indicted for capital murder on January 18, 2011. On March 23, 2011, Evans, through appointed counsel, moved for a psychiatric or psychological evaluation to determine (1) whether he knew right from wrong at the time of the crime, (2) his competence to stand trial, and (3) any mitigating circumstances. On May 18, 2011, Evans filed an amended motion for a mental evaluation, requesting that the trial court obtain the services of Dr. Beverly Smallwood to perform the evaluation. On May 26, 2011, the trial court entered an order for Dr. Smallwood to perform the evaluation, finding that "the Defendant

9

allegedly has a history of mental health treatment." The order directed Dr. Smallwood to evaluate Evans (1) to determine whether he knew right from wrong at the time of the alleged crime, (2) to determine whether he was competent to assist counsel in his defense, and (3) to prepare a mitigation study, if applicable.

¶18.    At a hearing on October 24, 2011, defense counsel informed the trial court that Dr. Smallwood felt she could not perform the ordered evaluation and that Dr. Smallwood had recommended that Evans undergo a thorough evaluation at the Mississippi State Hospital at Whitfield. The trial court granted Evans's request that the evaluation be conducted at Whitfield. On December 9, 2011, the trial court entered an order noting that both parties agreed that Evans should receive a psychiatric evaluation at the Mississippi State Hospital (1) to determine competency, (2) to determine whether he knew right from wrong at the time of the crime, and (3) to assess whether he was intellectually disabled.

¶19.    Delays attended the completion of Evans's evaluation, and the trial court continuously checked on the status of the mental evaluation at several hearings. On November 28, 2012, the trial court entered an amended order for a mental evaluation, ordering that Evans's evaluation take place at the Mississippi State Hospital "at the earliest possible date," "pursuant to Rule 9.06 of the Mississippi Uniform Rules of Circuit Court Practice" to determine, *inter alia*, "whether or not he has sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding in preparation of his defense, and has a rational as well as factual understanding of the nature and object of the legal proceedings against him . . . ." On January 18, 2013, Dr. Storer at the Mississippi State

10

Hospital notified the trial court by letter that the evaluation had been completed and that a summary report had been provided to Evans's attorneys.

¶20. Following this notification, the trial court conducted a hearing on February 26, 2013. At that hearing, the trial judge again inquired about the results of the evaluation. Defense counsel responded:

> Judge, Mr. Evans was seen at Whitfield, completed all of his evaluations and we have received the full report, the defense has received the full report and we are ready to move forward and we have come to an agreement on the trial date as well as on the nonevidentiary motion settings, the evidentiary motion setting and the omnibus hearing setting.
>
> . . .
>
> THE COURT: Mr. Thriffiley, I know the primary reason for the evaluation had to do with some mitigation but also I presume since you're ready to move forward that it found Mr. Evans was competent both to assist his counsel as well as to proceed to trial.
>
> [Defense Counsel]: Yes, Your Honor.
>
> THE COURT: All right.

After that exchange, the trial court proceeded to other pretrial matters.

¶21. Once again, on August 8, 2013, Evans's competency to stand trial was revisited in open court at an omnibus hearing:

> THE COURT: Defense, any claim of incompetency for the defendant to stand trial?
>
> Mr. Whittman: No, your honor.

The case proceeded to trial. Dr. Storer's report was not made a part of the record.

¶22. In addition to the presumption of innocence, another presumption accompanies criminal defendants—the presumption of competency. *See **Silvia v. State***, 175 So. 3d 533, 540 (Miss. Ct. App. 2015) (citing ***Billiot v. State***, 454 So. 2d 445, 463 (Miss. 1984)) ("A criminal defendant is presumed competent."). The burden of proof rests on the defendant to prove that he is mentally incompetent to stand trial. ***Richardson v. State***, 767 So. 2d 195, 203 (Miss. 2000).[1]

¶23. This Court has safeguarded the right not to be tried while incompetent by adopting Uniform Rule of Circuit and County Court Practice 9.06:

> If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.
>
> After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial. If the court finds that the defendant is incompetent to stand trial, then the court shall commit the defendant to the Mississippi State Hospital or other appropriate mental health facility.

---

[1]This Court has held that a competent defendant is one:

(1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

***Hollie v. State***, 174 So. 3d 824, 830 (Miss. 2015) (quoting ***Hearn v. State***, 3 So. 3d 722, 728 (Miss. 2008)).

URCCC 9.06. "[O]nce a mental evaluation is ordered, a competency hearing is mandatory."

***Hollie***, 174 So. 3d at 830. *See also **Beasley v. State***, 136 So. 3d 393, 398 (Miss. 2014) (affirming because an adequate competency hearing was held after the mental evaluation).

¶24. Based on Evans's motion and amended motion,[2] as well as the trial court's order, there was never a finding by the trial court that a "reasonable ground to believe the defendant is incompetent" existed. Of course, it is the trial court's responsibility to determine competency during an open-court hearing. When competency is placed at issue, the court should weigh all the evidence and determine whether the defendant is competent to stand trial.

¶25. Evans argues that his conviction must be reversed, not due to incompetency, but because the trial court failed to hold a separate hearing adjudicating his competency. The State counters that "[d]efense counsel admitted Evans was competent, based on the results of the mental evaluation, which obviated the need for a more protracted or extensive hearing." And "unlike ***Hollie***, a hearing was held where the court acknowledged and defense counsel admitted Evans was competent to stand trial."

¶26. As the State argues, the learned trial judge addressed Evans's competency at multiple hearings. During the February 26 and August 8, 2013, proceedings, defense counsel informed

---

[2]*See* ¶ 17 *supra*. Motions similar to those filed in this case have become rote practice, especially in death penalty cases—and for good reason. If the defendant is deemed incompetent, there is no reason to proceed to trial. Judges, defense attorneys, and prosecutors alike advance this request. However, the filing of a motion and the entry of a corresponding order may have little bearing on competency itself. The presumption of competence remains unless rebutted by some evidence from the defendant. The motions filed in this case make no assertions of incompetence. Rather, they are merely requests to have Evans evaluated. Even in this appeal, Evans has not asserted that he is or was incompetent.

the trial court that the examining doctors had found Evans competent and offered no evidence to dispute their findings. In other words, Evans never offered evidence to rebut the presumption of competency. Accordingly, having no evidence presented to the contrary, the trial court deemed Evans competent, and the case proceeded to trial.

¶27. Not only did the trial court have a statement by an officer of the court that the report found Evans competent, the trial judge was accorded numerous opportunities to observe Evans in pretrial hearings—no less than thirteen times[3]—at many of which Evans himself addressed the court, assisting his counsel. Evans further affirmed that he understood the procedural aspects of securing a mitigation expert and a mental evaluation. He specifically stated that he understood that seeking a mental evaluation may take time, which would delay his trial. He affirmed consultations with his attorneys and declared that was the course he wanted to pursue. When Evans's evaluation was delayed, the court repeatedly inquired as to its status, if he understood the status, and if he still wished to pursue the evaluation. Each time, he responded, "Yes, ma'am." At one of the multiple hearings, Evans described in detail the medical care he had been receiving at the jail. He described his medical history. He complained that he was not receiving proper medical care partly because, during the pendency of his incarceration, he had sued the medical director and claimed the doctor was now denying him treatment as retribution. When discussing the delay in his evaluation, Evans offered that he hoped to acquire funds through the lawsuit to enable him to hire a private

---

[3]The trial judge observed Evans at pretrial hearings on the following dates: April 26, 2011; October 24, 2011; January 9, 2012; April 26, 2012; July 16, 2012; July 23, 2012; August 6, 2012; November 5, 2012; February 26, 2012; May 23, 2013; July 2, 2013; July 31, 2013; and August 8, 2013.

14

psychologist or psychiatrist. When the attorneys could not immediately recall why Dr. Smallwood was unavailable, Evans raised his hand, was recognized by the court, and stated,

> When we did this hearing last year, October 24th, Dr. Smallwood had contacted [defense counsel] and said that she couldn't conduct an extensive amount of evaluation that needed to be done. . . . She said she wasn't able to conduct th[at] testing[;] that's why she wouldn't be able to fulfill the obligations.

At a later hearing, Evans informed the court that he had been seen by a medical doctor at the jail but that his needs were not being met. He alleged that the medical director had interrupted his preliminary mental evaluation. He further informed the court that his medications kept changing without explanation.

¶28. Following defense counsel's statement during the February 26 hearing that the report found Evans competent, the trial judge noted, "[A]s I've explained on this record before[,] this [c]ourt's concern with regard to the medical had to do with Mr. Evans being able to be evaluated, to be sufficiently *competent* and physically and mentally able to participate in his own defense with his attorneys." At that same hearing, Evans stated that he had been attacked at the jail by fellow inmates. He described both the details of the incident and the administrative procedures that followed. He then described going to Whitfield and meeting with Doctors Storer and McMichael. Evans was in possession of their report from that day and read portions of the report to the judge. At yet another pretrial hearing, the court reiterated, "Now Mr. Evans has to be physically and mentally healthy enough to go to trial. He has to be physically and mentally healthy enough to assist his attorneys. That's the only way we're going to get this trial done or a plea if you guys work out a plea." Evans consented

15

to the court ordering Whitfield to forward his evaluation to Dr. Zimmerman, who would be one of Evans's mitigation experts. Finally, at the omnibus hearing, the court asked again of defense counsel if there were any claims of incompetence to stand trial or if any defense of insanity would be pursued. Counsel responded, "No, Your Honor." Trial began eleven days later.

¶29.    The trial court considered defense counsel's unrefuted statements—made not once, but twice—as an officer of the court that the ordered evaluation resulted in a finding that Evans was competent to stand trial. The court also had the benefit of its own observations of Evans during multiple hearings. The failure to enter the evaluation into the record does not render the trial judge's determination of competency erroneous. Evans presented no evidence to rebut the presumption of competency. On one side of the scales of justice lay the presumption of competency, statements by an officer of the court that Evans was competent, and the trial judge's numerous observations. The other side lay empty. Therefore, no issue of Evans's competency remained. On at least two occasions in the record, the trial court related that it would not proceed to trial unless Evans was competent to stand trial. The fact that the court proceeded to trial is record evidence that the court deemed Evans competent.

¶30.    The State also argues that this Court should affirm because the purposes of Rule 9.06 were satisfied under the circumstances regarding the specific facts of this case. *Hollie* recognized that, on one occasion, this Court held that the failure to hold a competency hearing after a mental evaluation was ordered was not reversible error because "the purposes of Rule 9.06 ha[d] been satisfied under the circumstances." *Hollie*, 174 So. 3d at 830 (citing

16

***Hearn v. State***, 3 So. 3d 722, 730 (Miss. 2008)). In ***Hearn***, although a mental evaluation had been ordered, no competency hearing occurred. ***Id.*** This Court found that:

> the trial court failed to comply in the strictest technical sense with Rule 9.06 which mandates that a competency hearing be conducted following a court-ordered mental examination. Miss. Unif. Circ. & Cty. R. 9.06 ("After the examination the court *shall* conduct a hearing . . . .") (emphasis added). However, Dr. Montgomery testified at trial as to Hearn's competency and was subjected to cross-examination. Because Hearn was afforded the opportunity to present competing evidence, the purposes of Rule 9.06 were satisfied.

***Id.***

¶31.    Assuming, *arguendo*, that what transpired before the trial court did not result in the formal words, "I adjudicate the defendant competent," in the competency hearing held, the purposes of Rule 9.06 were satisfied. In addition to the defense attorney relating to the court that the examination revealed that Evans was competent, no evidence of incompetence was presented—combined with the trial court's multiple opportunities to observe and interact with Evans during the litany of pretrial hearings

¶32.    Further confirming that the purposes of Rule 9.06 were satisfied, Dr. Storer, who performed Evans's mental and competency evaluation pretrial, testified during the sentencing phase of Evans's trial. During the competence assessment, Storer asked Evans to explain how a jury would reach a decision in the guilt phase of the trial. After some clarification by Dr. Storer, Evans responded, "Look at all the evidence, forensic evidence, police reports, listen to the presentation of both sides, defense and the [d]istrict [a]ttorney." When asked if Evans understood Dr. Storer's purpose, he knew Storer was to give him a psychological

17

examination to "[s]ee if [Storer could] be of assistance in [Evans's] case, insane or not insane at the time" and address "mitigating factors." In Storer's testimony, he explained,

> Finally[,] we used a—because competence was one of the things that we were asked to evaluate, . . . it's typically known that if somebody is going to be ruled incompetent it's due to a mental disease or mental defect. So I administered what's called personality assessment inventory to assess whether or not there was any serious mental illness going on. . . . Mr. Evans did fine on all of those scales. He appeared to be answering items honestly so the results appeared to be valid.

¶33. As part of our desire to ascertain truth and a fair application of our laws, we focus on constitutional rights, statutory rights, and rules of procedure—the first two being substantive in nature. We find no evidence that Evans's substantive right not to be convicted while incompetent was violated. To be clear, the better practice is for our trial judges definitively to adjudicate competency on the record. However, the record in this case reveals that the trial court was assiduously vigilant to ensure Evans's competence to stand trial was protected. The purposes of Rule 9.06 were satisfied. We discern no error by the trial judge.

II.   WHETHER THE JURY SELECTION PROCESS WAS CONSTITUTIONALLY INFIRM AND REQUIRES REVERSAL OF EVANS'S CONVICTION AND SENTENCE OF DEATH.

A.   *Whether the trial court improperly and prejudicially limited defense voir dire.*

¶34. "[C]ounsel must have latitude in searching the minds and consciences of jurors in order to be able to exercise their peremptory challenges intelligently." ***Odom v. State***, 355 So. 2d 1381, 1383 (Miss. 1978); *see also* Miss. Code Ann. § 13-5-69 (Rev. 2012) ("the parties or their attorneys in all jury trials shall have the right to question jurors who are being impaneled with reference to challenges for cause, and for peremptory challenges)."

It is therefore perfectly proper for counsel to ask further questions beyond the court's inquiries reasonably necessary to assure himself and the court that the jurors selected will give his client the benefit of every right to which he is entitled under the law, as well as to reveal or signify particular antipathies that could prejudice his client before any proposed juror.

*Harris v. State*, 532 So. 2d 602, 607 (Miss. 1988).

¶35. Evans argues that the trial court erred by sustaining the State's objection to a question by defense counsel during voir dire concerning the jurors' willingness to use alcohol abuse as mitigation. Defense counsel asked if any venire members had "prior contact" with alcohol abuse themselves or with family members. Twenty-four venire persons raised their hands. Counsel asked if alcohol were involved in the case if any juror's ability to serve would be affected; all said "no." Then, the following occurred:

> [Defense counsel]: Would anyone have a problem considering that as a mitigating circumstance before rendering either a death sentence or life without possibility of parole? In other words, can everyone use or consider an alcohol problem as a mitigating circumstance?
>
> [the State]: Objection, Your Honor, asking for a commitment.
>
> THE COURT: Sustained.
>
> [Defense counsel]: Let me rephrase that then. If you can raise your hand if anyone could not use that as a mitigating circumstance[].
>
> [the State]: Same objection, Your Honor.
>
> THE COURT: Sustained.
>
> JURORS: I don't understand that.
>
> THE COURT: The objection was sustained. He will rephrase it.

19

Defense counsel then inquired, without objection, "Does anyone think that mitigating evidence should not be used to consider the sentence?" Counsel noted that none responded.

¶36.    Evans argues that the trial court improperly limited defense *voir dire* by sustaining the State's objection to the questions asking if the jurors could or could not *use* an alcohol problem as a mitigating factor.

¶37.    The State argues that the trial court properly sustained the objection because Evans's question sought to secure a pledge that, if alcohol abuse were present, the jury would use alcohol abuse as mitigation. The State argues that the question violated the rule that the parties may not extract pledges or promises from potential jurors. ***Harris v. State***, 532 So. 2d 602, 605-07 (Miss. 1988). When presented with mitigating evidence, it is exclusively the province of the jury to accept or reject that evidence. Under Uniform Rule of Circuit and County Court Practice 3.05, an attorney may not ask "hypothetical questions requiring any juror to pledge a particular verdict." URCCC 3.05.

> [T]his Court has repeatedly admonished and condemned attempts in *voir dire* questioning to exact a promise or commitment from jurors on how they will decide a particular case. Indeed, in ***Stringer***, *supra*, we reversed because of an accumulation of several errors, including the error of permitting the prosecution over objection to ask questions seeking a commitment from the jurors. Questions such as these are never necessary to accomplish the basic purpose of securing fair and impartial juries.

***Harris***, 532 So. 2d at 607 (citations omitted). The trial judge has considerable discretion in determining the propriety of a *voir dire* question. ***Harris***, 532 So. 2d at 607.

¶38.    Evans argues that defense counsel's question did not attempt to secure a pledge or promise from the potential jurors that they would find an alcohol problem mitigating.

20

Counsel's first question,[4] standing alone, was likely permissible. However, counsel failed to give the jury the opportunity to respond before rephrasing his question. The trial court sustained the State's objection to Evans's second question that asked the venire members if they could "*use* or consider an alcohol problem as a mitigating circumstance." (Emphasis added.) It is the conflation of "use" and "consider" that was impermissible.[5] Asking the jurors to "use" sought a pledge from the venire that they would use an alcohol problem as mitigating. When Evans rephrased the question, he asked the venire members if they *could not use* an alcohol problem as mitigating. Thus, Evans was inquiring whether any member of the venire, if the evidence demonstrated an alcohol problem, would not use such evidence as mitigating. Evans then asked, without objection, "Does anyone think that mitigating evidence should not be used to consider the sentence?" Notably, this question, like the first, used the word "consider" rather than "use."

¶39.    This Court has ruled that any inquiry into the attitudes of the venire as to the defendant's alcohol abuse is hypothetical. In ***Holland v. State***, 705 So. 2d 307, 338 (Miss. 1997), Holland asked the jurors "if there was alcohol possibly consumed or alcohol involved in this case would you rule that out as a mitigating factor prior to passing on the life without

---

[4]"Would anyone have a problem considering that as a mitigating circumstance before rendering either a death sentence or life without possibility of parole?"

[5]Evans attempted to use two words as synonymous which could not be more distinct. "Use" is defined as "to bring or put into service or action; to put to some purpose." *Use*, Webster's II *New College Dictionary* 1215 (2001). "Consider," however, means "to think about seriously." *Consider*, Webster's II *New College Dictionary* 240 (2001). Evans erred by asking the venire if it could or could not *use* alcohol as a mitigating factor rather than asking if it would or would not be willing to *consider* it as mitigating.

21

parole or a death penalty?" The trial court sustained an objection to the question as hypothetical. *Id.* This Court affirmed. *Id.* Like Evans, Holland relied on ***Morgan v. Illinois***, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), which held that the Constitution requires that defense counsel be allowed to inquire whether potential jurors will be able to consider mitigation evidence at all, or whether they automatically will impose the death penalty. This Court found that Holland's question fell outside the parameters of ***Morgan*** and was an impermissible hypothetical question. Evans cites a more recent United States Supreme Court opinion recognizing that "our cases ha[ve] firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual . . . ." ***Abdul-Kabir v. Quarterman***, 550 U.S. 233, 246, 127 S. Ct. 1654, 1664, 167 L. Ed. 2d 585 (2007). But ***Abdul-Kabir*** arose in the context of jury instructions, not *voir dire*, and it does not alter the law relied upon in ***Holland***. *Id.* at 237-38. In ***Holland***, this Court held that a question about whether potential jurors are able to rule out alcohol abuse as mitigating is properly denied. ***Holland***, 705 So. 2d at 339. The venire cannot be asked whether it will accept or reject the evidence before it is presented to it. In light of ***Holland***'s clear holding condemning an almost identical question, we find that this issue is without merit.

> B.    *Whether reversal is required because a peremptorily struck juror was seated on the jury.*

¶40.    The record reflects that Evans exercised peremptory strike D-3 on "Number 17, Ms. Kergosien." Evans then accepted "number 19, Ms. Cuevas." The transcript reveals that "the following jurors were selected and placed into the box . . . 4. Rosalie Kergosien." That

portion of the transcript does not reflect Ms. Cuevas among the seated jurors. Defense counsel did not object to the jury as seated.[6] Evans now argues that the trial court seated Kergosien, a struck juror, instead of Cuevas, violating his right to a fundamentally fair trial and necessitating automatic reversal. He cites *Hardison v. State*, 94 So. 3d 1092, 1101-02 (Miss. 2012), which held that the erroneous denial of a peremptory challenge cannot be harmless error when the objectionable juror is seated on the panel that convicts the defendant.

¶41.   The State replies that the transcript disputes Evans's contention that a struck juror, Kergosien, actually was seated. After the guilt-phase verdict, the trial court polled the jury:

THE COURT: . . . Is this your verdict, Ms. Ladner?

Ms. Ladner: Yes.

THE COURT: Mr. Ladner?

Mr. Ladner: Yes.

**THE COURT: Ms. Cuevas?**

**Ms. Cuevas: Yes.**

THE COURT: Ms. Newman?

Ms. Newman: Yes.

---

[6]A contemporaneous objection is required to preserve an error for appeal. *Williams v. State*, 684 So. 2d 1179, 1193 (Miss. 1996). However, "[w]e have in death penalty cases the prerogative of relaxing our contemporaneous objection and plain error rules when the interest of justice so requires." *Evans v. State*, 725 So. 2d 613, 691 (Miss. 1997); *McGilberry v. State*, 843 So. 2d 21, 30 (Miss. 2003). Under the plain-error doctrine, this Court will address only errors which affect substantial rights, resulting in a manifest miscarriage of justice. *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005).

THE COURT: Ms. Sellier?

Ms. Sellier: Yes.

THE COURT: Ms. Dao?

Ms. Dao: Yes.

THE COURT: Mr. Holliman?

Mr. Holliman: Yes.

THE COURT: Mr. Larsen?

Mr. Larsen: Yes.

THE COURT: Ms. Ladner?

Ms. Ladner: Yes.

THE COURT: Ms. Martin?

Ms. Martin: Yes.

THE COURT: Mr. Sosville?

Mr. Sosville: Yes.

THE COURT: Mr. Breland?

Mr. Breland: Yes, ma'am.

The transcript of the polling of the jury does not reflect that Kergosien served on the jury that returned the verdict. It reveals that the trial court polled Ms. Cuevas, juror 19, and Ms. Cuevas responded affirmatively to the court's question. Unless we assume the court erred when it addressed the juror, and further assume the juror erred by not recognizing the court's error and responding to a question addressed to someone else, we cannot accept Evans's

24

argument. Such assumptions cannot be entertained to find error. We find that Evans has failed to demonstrate on appeal that Kergosien mistakenly served on the jury, resulting in a miscarriage of justice.[7]

        C.       *Whether jurors' untimely responses to voir dire questions resulted in an unfairly selected jury.*

¶42.    Evans concedes that he failed to preserve this issue for appellate review and requests that this Court review it for plain error.[8]

¶43.    Evans's first argument concerns prospective juror St. Amant. This venire member was involved in several interactions with the trial court during jury selection. He stated that he could not be fair, he said that he would have a problem with sequestration; he requested an antacid; he asked for a drink of water; and he indicated that the death penalty is not given enough. When the jury returned from its lunch break, a venire member reported that St. Amant had spoken with defense counsel during the lunch break, although defense counsel had told him more than once that they could not speak with him. The trial court ascertained that "counsel as I understand it had some conversations about the case itself." St. Amant was dismissed for cause.

¶44.    Evans argues that the trial court erred by failing to inquire of the venire whether St. Amant had had any improper communication with other venire members. Evans points out that the record shows that, after the lunch break, St. Amant had contact with at least one other

---

    [7]A contrary ruling would require us to look for proof outside the record, which we cannot do on direct appeal. Evans may seek to pursue this issue in appropriate post-conviction filings, assuming such proof exists.

    [8]*See* n.6 *supra*.

venire person from whom he acquired antacid medication. Evans cites *Puckett v. State*, 737 So. 2d 322 (Miss. 1999). In *Puckett*, it was discovered during trial that a prospective juror had discussed the case with other venire persons during a break, including expressing opinions about delays in the case and about the death penalty. *Id.* at 331. The trial judge extensively inquired into the prospective juror's contact with other venire members and excused the errant prospective juror and another venire member who was found to have heard that person's comments about the case. *Id.* This Court held that, due to the trial court's measures, no mistrial was required. *Id.* at 332. Unlike in *Puckett*, there was no indication that St. Amant had discussed the case with other venire persons. The venire person who reported St. Amant's communication with defense counsel did not indicate that St. Amant had made any improper comments to any other persons. It is entirely speculative whether St. Amant made any improper comments to the venire. We can discern no plain error.

¶45.    Next, Evans complains that the trial court should have questioned individually four venire persons who simply walked out during the proceedings. When these wanderers returned, the trial court strongly admonished them, stating:

> Folks, when y'all get up and just walk out it's downright rude because everybody has to sit and wait on you. If you need a break you need to ask for it and we can all take a break at the same time, but I have never in my life seen people behave like this and it had better not happen again. That was four of you that just got up and walked out one at a time and everybody else, the other 92 people had to sit here and wait on you. If you need a break or you have an emergency at least have the courtesy to your fellow jurors to raise your hand and ask for us to take a break. Anybody unclear on that?

Although Evans argues that the trial court should have paused the proceedings and questioned each wanderer individually, we find that, because the record discloses no

26

impropriety by any of those persons other than leaving the courtroom without permission, the record does not reveal plain error.

¶46. Next, Evans contends that several selected jurors failed to respond to relevant questions during *voir dire*, thwarting his ability to intelligently exercise peremptory challenges. "The failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause." ***Odom v. State***, 355 So. 2d 1381, 1383 (Miss. 1978). In ***Odom***, a prospective juror did not respond to a *voir dire* question about whether he had any close relatives in law enforcement, despite the fact that his brother was one of the officers who investigated the crime with which the defendant had been charged. ***Id.*** at 1382. This Court devised the following procedure:

> where, as here, a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on *voir dire*, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the *voir dire* examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong.

***Id.*** at 1383. The Court found that Odom was entitled to a new trial due to the strong inference of prejudice. ***Id.***

27

¶47. Evans argues that Juror Larsen failed to respond to questioning about whether he knew any of the witnesses in the case. After the victim's son, John Compton, and another witness testified, Larsen asked to approach the bench and informed the trial court that he thought Compton might be his son's boss, although he was unsure. Larsen said that he did not respond at *voir dire* because he knew his son's boss only by sight, not by name. Larsen informed the trial court that this did not affect him one way or another and did not change his ability to be fair to both sides. Neither side objected to Larsen remaining on the jury.

¶48. Next, Evans contends that juror Emily Ladner failed to respond to questioning about whether any prospective jurors had any obligations that would interfere with sequestration. After jury selection, Emily Ladner, in tears, approached the bench and explained that she had just learned her husband had to go out of town for work and she would have no one to care for her child. After discussion with the parties, the trial court allowed her to call her husband to tell him not to leave town. When she returned, the trial court questioned her and ascertained that she had texted him and instructed him to reschedule his trip. The trial court assured her the child would not be left alone and instructed her to inform the court at once if the husband was unable to delay his trip. Evidently, the child-care problem was worked out, and defense counsel did not object to Emily Ladner's participation on the jury.

¶49. Evans also complains that two jurors, Tanya Ladner and Dennis Sosville, raised questions after selection that related to matters on which they had failed to respond during voir dire. Tanya Ladner expressed her desire to attend her child's birthday party on the Friday of the week of trial, and Sosville said he had a commitment on Saturday and wanted to know

28

if the trial would be over by then. Defense counsel asked if, on Friday, the trial court could arrange for Tanya Ladner to call her eight-year-old son to wish him a happy birthday. The trial court agreed. Defense counsel did not object to these jurors' service.

¶50.    We find that none of these circumstances rises to the level of reversible error under the plain-error doctrine. Although Larsen said that he believed he knew the State's witness, John Compton, nothing shows that Larsen failed to respond truthfully during *voir dire*. He simply did not know Compton's name, and thus did not discover that he might be acquainted with him until he testified. Most vitally, unlike in **Odom**, Larsen had no familial relationship with Compton. He simply thought he might be his son's boss, and he said it would not affect his ability to be impartial. In **Magee v. State**, 124 So. 3d 64, 68 (Miss. 2013), this Court held that the fact a juror was the arresting deputy's fourth cousin was too distant a kinship for the juror to have been expected to respond to questions about family in law enforcement. We find no plain error.

¶51.    And nothing in the record shows that Emily Ladner failed to respond truthfully to questions. Nothing shows she knew at the time the venire was questioned about child-care responsibilities that her husband would not be home. Instead, the record indicates that she learned after her selection that her husband had been called away on business. Therefore, no violation of **Odom** occurred, and we find no plain error.

¶52.    As for Tanya Ladner and Dennis Sosville, Evans argues that, although "these two jurors' post-selection issues might not warrant reversal, they are corroborative of the larger

problems with the jury following instructions." No inference of prejudice can be drawn from the participation of these jurors in Evans's trial. We therefore find no plain error.

III.     ISSUES WITH THE JURY, EXACERBATED BY ITS APPARENT INABILITY TO FOLLOW JUDICIAL INSTRUCTIONS, ALSO INFECTED THE TRIAL ITSELF WITH REVERSIBLE ERROR.

A.     *Whether the seating of an alternate juror in the sentencing phase violated Mississippi's capital sentencing scheme.*

¶53.    Evans next claims that his state and federal rights to a fair trial by a qualified jury and the state constitutional and statutory guarantees of jury sentencing in death-penalty cases was violated by the departure of Tanya Ladner and the seating of alternate juror Larry Lind. After guilt-phase deliberations, but prior to the sentencing phase, juror Tanya Ladner was excused upon learning that her son had suffered an injury requiring emergency surgery. The trial court replaced Tanya Ladner with alternate juror Lind. Lind had been sequestered with the jury and sat with the jurors throughout the trial. He had heard all of the evidence, but as an alternate, he had not participated in guilt-phase deliberations. As Ladner's replacement, he joined and participated in the sentencing-phase deliberations.

¶54.    Evans argues that Lind's seating as an alternate violated Mississippi's statutory capital sentencing scheme, which requires that:

(1) Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty.

Miss. Code Ann. § 99-19-101 (Rev. 2015). Evans argues that, under this statute, if the guilt-phase jury is unable to reconvene, the trial judge must summon a sentencing-phase jury, and that the statute should not be read to permit the seating of an alternate juror at the sentencing phase, despite Lind's participation as an alternate to the trial jury.

¶55.   Another statute applicable to capital and noncapital cases provides that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties . . . . An alternate juror who does not replace a regular juror shall be discharged at the time the jury retires to consider its verdict." Miss. Code Ann. § 13-5-67 (Rev. 2012). Substitution of an alternate juror is proper if done before the jury retires for deliberations. *Folk v. State*, 576 So. 2d 1243, 1251 (Miss. 1991). A substitution of an alternate juror during jury deliberations is improper. *Id.* at 1252; *Balfour v. State*, 598 So. 2d 731, 753 (Miss. 1992). And the trial court's decision to dismiss a juror for good cause and substitute an alternate is reviewed for abuse of discretion. *Shaw v. State*, 540 So. 2d 26, 28 (Miss. 1989). The defendant must show actual prejudice from the exclusion and substitution. *Id.*

¶56.   Considering the fact that Section 13-5-67 allows the substitution of alternate jurors in capital cases, the trial court's substitution of Lind at the sentencing phase did not violate Section 99-19-101. Rather than discharging the alternate jurors after the guilt phase ended, the trial court permitted them to remain through the sentencing phase in case substitution was necessary. As an alternate juror, Lind did not participate in deliberations with the twelve-member panel, which undoubtedly would have been improper. *See Luster v. State*, 515 So.

2d 1177, 1180 (Miss. 1987). However, when the trial court dismissed Tanya Ladner, the trial court substituted Lind for the sentencing-phase jury trial and deliberations, leaving the jury composed of twelve jurors who had heard all of the evidence presented. A purpose of selecting alternate jurors is so they are available to "fill the gap created by some contingency." *Walls v. State*, 371 So. 2d 411, 413 (Miss. 1979). We discern no error.

> B. *Whether the trial court erred by denying Evans's motion for a mistrial due to jury communications during deliberations.*

¶57. Evans argues that the trial court erred by denying his motion for a mistrial based on an inference that the jurors, during guilt-phase deliberations, had not followed the jury instructions prior to reaching a verdict. After the jury had retired to deliberate guilt, the trial court entered the following:

> For the record, and the attorneys are already aware of this as is the defendant, the jury first advised verbally that they had a question. They were told to write down the question. And then they advised, a different juror that there was a hung jury and then a third juror came out and actually handed the question to the bailiff. The attorneys were allowed read the question and then to retire to determine how they wanted to handle this and for the defense to be able to speak with Mr. Evans. The question will be marked as part of this record. It says some jurors believe one or more jurors are in violation of the judge's instructions. What recourse do we have? While the attorneys are able to determine how they wanted to proceed and how they wanted to handle this matter, and basically asked if the attorneys agreed to make a record on this, there was a knock at the door and the bailiffs were advise[d] that there was, in fact, a verdict in this matter. So apparently whatever the question was, whatever the problem was, the jurors have resolved amongst themselves without the necessity of the parties and the Court inquiring further of them.

¶58. At that point, Evans moved for a mistrial on the ground that the note made it clear that some of the jurors were not following the court's instructions. The trial court opined that the note could be read in a number of ways, and could indicate noncompliance with the

instructions of law, or a dispute about interpreting the instructions of law or a violation of some other instruction. Because the jury had reached a verdict, the trial court decided to deny the mistrial, receive the verdict, and to then ask the jury foreman if they were able to

> follow the other instructions with regard to not doing any research, et cetera. Some question of that type because that would be the only issue in my mind that would perhaps be cause for a mistrial. In other words if they are simply disagreeing over the instructions of law that's entirely within the province of the jury.

After discussion, the defense agreed with that plan.

¶59. When the jury returned to the courtroom with the verdict, the trial court ascertained that Mr. Breland had been selected as the foreperson and that the jury had reached a unanimous verdict.

> THE COURT: Sir, if you will hand [the verdict] to the bailiff for me. Mr. Breland, I have one other question for you while you are up, sir. In light of the question, the written question that was sent out by the jury, my only inquiry of you is this. Was the concern of some of the jurors that someone had not followed the instructions that you guys have been given each evening and during the lunch breaks?
>
> MR. BRELAND: No, ma'am.
>
> THE COURT: So this dispute had to do with simply your discussions of law and the evidence?
>
> MR. BRELAND: Yes, ma'am.
>
> THE COURT: All right, sir. Thank you. You can have a seat.

¶60. Evans argues that, because Mr. Breland responded that the jurors had not disobeyed the court's evening and lunch-break instructions on things like avoiding media coverage and not discussing the case amongst themselves, the jury's written question must have concerned

jurors having violated the court's instructions of law. This Court presumes that jurors have followed the instructions of the court, because to presume otherwise would render the judicial system inoperable. *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985). As the State argues, the jury's note does not require the conclusion that the jury violated the instructions of law. Rather, as the trial court recognized and Mr. Breland confirmed, the note could have expressed a disagreement among the jurors concerning their discussions of the law or facts. Regardless, the jury resolved whatever issue it had without court intervention and unanimously agreed on a verdict. This issue is without merit.

> C.     *Whether the trial court erred by allowing the jury to reform the sentencing-phase verdict.*

¶61.    Evans argues that reversible error occurred when the trial court instructed the jury to reform the verdict after it returned a facially invalid sentencing-phase verdict. At the conclusion of the sentencing phase, the trial court gave the jury an omnibus instruction telling them exactly what they needed to find in order to impose a sentence. The instruction set forth a specific form of the verdict. When the jury reached a verdict, the trial court reviewed the verdict and discovered that it was not in the proper form. The verdict sentenced Evans to death, but it stated only the aggravating circumstances. The trial court asked the jury to return to the jury room, review the instructions on the form of the verdict, and provide the court with the form chosen. The trial court stated "[e]ither all of number one, all of number two or all of number three. It has to be exactly like on the instruction." The jury then conformed its verdict in the proper form and returned that verdict to the court.

34

¶62. A statute and precedent clearly establish that the trial court properly instructed the jury to reform its verdict. "If the verdict is informal or defective the court may direct it to be reformed at the bar." Miss. Code Ann. § 99-19-11 (Rev. 2015). In *Dickerson v State*, 175 So. 3d 8, 28 (Miss. 2015), the jury returned a verdict that was not in the proper form because it did not list the aggravating factors. *See* Miss. Code Ann. § 99-19-103 (Rev. 2015) ("[t]he jury . . . shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt. Unless at least one (1) of the statutory aggravated circumstances enumerated in Section 99–19–101 is so found . . . the death penalty shall not be imposed"). This Court found that the trial court properly had instructed the jury to reform the verdict to comply with the jury instructions. *Id.* In *Dickerson*, the trial court did not instruct the jury to make any particular finding but only to correct the formal defects in the verdict. As in *Dickerson*, the trial court here properly instructed the jury to reform the verdict to comply with the jury instructions. We find no error in doing so.

IV. THE TRIAL COURT COMMITTED REVERSIBLE EVIDENTIARY ERROR AT BOTH PHASES OF THE PROCEEDINGS.

¶63. Evans makes several arguments concerning the admissibility of evidence during both the guilt and sentencing phases. This Court reviews the trial court's decisions admitting or excluding evidence for abuse of discretion. *Green v. State*, 89 So. 3d 543, 549 (Miss. 2012). We will not reverse unless the ruling resulted in prejudice to the accused. *Id.*

A. *Whether excluding evidence of the victim's blood-alcohol content deprived Evans of his right to present a defense.*

35

¶64.    Dr. McGarry's autopsy report showed that Holling's blood-alcohol level was .127 at the time of her death.[9] During trial, the State moved to exclude any evidence of Holling's blood-alcohol level. Evans opposed the motion, arguing that Holling's recent alcohol intake rebutted Joe Thomas's testimony that she did not drink and that it was relevant to show she may have provoked Evans to kill her. The trial court found that Thomas had not testified that Holling did not drink, but rather that he had never seen her drink. The trial court granted the motion because, "at this point on this record, and again there is no been self-defense raised [sic], there's no claim that she was the initial aggressor, there's been no testimony with regard to her particular behavior at this time of the particular incident," so the evidence was not relevant. The trial court further found that, for the evidence to be relevant, there would have had to have been testimony as to how alcohol would have affected her behavior. The trial court invited the defense to raise the issue again, at any point, if it became relevant. However, Evans never again raised the issue.

¶65.    Evans argues that the trial court's exclusion of Holling's blood-alcohol level was an abuse of discretion. He argues that it was relevant to his manslaughter defense at the culpability phase and at the mitigation phase. He now contends that *after* the trial court's ruling, when the State introduced Evans's February 18, 2010, statement that he killed Holling after the two fought about his taking her credit card, evidence of Holling's blood-alcohol content became relevant. Assuming relevance for the sake of argument only, Evans made no

---

[9]It is illegal for a person twenty-one years of age or older to operate a noncommercial motor vehicle in this state if his/her blood-alcohol level is .08 or higher. Miss. Code Ann. § 63-11-30(1)(d)(I) (Rev. 2013).

further attempt at trial for the trial court to reconsider its prior ruling. Thus, the issue is waived.

¶66. Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence more probable or less probable. M.R.E. 401. In **Mallett v. State**, 606 So. 2d 1092, 1095 (Miss. 1992), this Court held that evidence of the victim's intoxication is not relevant in and of itself. Evidence of the victim's intoxication is not relevant absent evidence that the accused acted in self-defense. **Farmer v. State**, 770 So. 2d 953, 958 (Miss. 2000).

¶67. We find that the trial court's exclusion of the evidence of Holling's blood-alcohol content was not an abuse of discretion. Evans did not offer any evidence to support a self-defense theory. When the trial court granted the State's motion, Evans's statement was not yet in evidence. And even if it had been in evidence, neither the statement nor any other evidence adduced suggests that Holling was the initial aggressor. As Evans did not raise the issue again, even though invited to do so by the trial court, we find no error. This issue is without merit.

> B.     *Whether the trial court erred by denying Evans's motions to suppress his statements in the absence of a determination as to his competency.*

¶68. Evans complains that the trial court's denial of his motions to suppress was done without an adjudication of his competency. Because Evans presented no evidence to overcome the presumption of competency—coupled with the trial court's observations of Evans and defense counsel's relating to the court that Dr. Storer had found Evans competent, which was later confirmed by Dr. Storer's testimony[10]—this issue is without merit.

---

[10]*See* ¶ 32 *supra*.

C.	*Whether the admission of a photograph of Holling's body where it was discovered, and testimony from the pathologist concerning it, was irrelevant and unduly inflammatory.*

¶69.	The State sought to admit three photographs depicting Holling's body where it was discovered in the woods to show the location of the body and to supplement the testimony of the investigating officers. Evans objected on the ground that, because the killing had not taken place where the body was discovered, the photographs lacked probative value. Evans also complained that, because the body had sustained animal predation after the death, the photographs would show injuries not caused by Evans and were extremely prejudicial. The trial court admitted only one of the photographs, photograph S-13, finding it to be relevant to the issues. It is hardly gruesome. The trial court excluded the other two photographs, one because, due to its angle, it was not particularly probative, and the other because its depiction of postmortem animal predation was more prejudicial than probative.

¶70.	"Photographs are considered to have evidentiary value in the following instances: (1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; (3) supplement or [clarify] witness testimony." **Dampier v. State**, 973 So. 2d 221, 230 (Miss. 2008) (quoting **McIntosh v. State**, 917 So. 2d 78, 84 (Miss. 2005)). "The discretion of the trial judge is 'almost unlimited . . . regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.'" **Dampier**, 973 So. 2d at 230. Nonetheless, "[m]eaningful limits must be placed on a trial judge's discretion to admit photographs, and those limits must be defined by weighing a photograph's probative evidentiary value against its prejudicial potential to arouse the passions of the jury." **Bonds**

***v. State***, 138 So. 3d 914, 920 (Miss. 2014). There is nothing in this photograph which to the naked eye would potentially arouse the passions of the jury.

¶71.    As directed in ***Bonds***, the trial court carefully considered the probative value versus the prejudicial effect of each of the three photographs proffered by the State, and after that weighing process, it excluded two of them. Photograph S-13 was relevant to "describe the location of the body." And, as the trial court found, photograph S-13 was not particularly gruesome. Photograph S-13 is a long- or medium-range distance photograph of a clothed body lying in the brush along a highway. No animal predation is visible to the naked eye. We find the trial court did not abuse its discretion by finding that photograph S-13 was more probative than prejudicial.

> *D.*    *Whether Evans's conviction must be reversed because the State violated the Constitution and Mississippi Rules of Evidence by eliciting evidence of otherwise inadmissible prior bad acts and criminal convictions from Dr. Storer.*

¶72.    The defense called Dr. Storer to testify in mitigation at the sentencing phase. After establishing that Evans had a history of using alcohol at an early age, defense counsel asked the following:

> Q. Now, Doctor, in searching through his background you also listed his lengthy history of run-ins with the law, correct?
>
> A. I did.
>
> Q. Those run-ins with the law generally revolved around what?
>
> A. They appear to revolve primarily around substance abuse and substance abuse problems.

Q. I guess, buttressed against the age in which he started drinking would that, I guess, be typical or follow?

A. Actually considering the age that he began drinking and using other drugs I would expect that he would have had some problems as a juvenile as well. . . . I would have expected some juvenile involvement, some Youth Court involvement prior to that. But from age 22 on up he has been in and out of jams with the authorities.

Q. Mainly on alcohol related or drug related?

A. It appears to be primarily around substance abuse.

On cross-examination, the State elicited the following testimony:

Q. Now, Doctor, you were asked on direct exam if criminal history was – if his criminal history was based on alcohol abuse, weren't you?

A. There was a question around – I don't remember the exact layout.

Q. But, you were not allowed to see the report or know the facts of the crimes of which he was arrested or convicted that are listed in the report, were you?

A. No, I was.

Q. All you know is what was listed as this was the charge, this was the date and this was the result?

A. And on some of these factors we asked him about them during the evaluation, but we did not ask him every single one, and there were some that he didn't remember the circumstances on.

Q. Sure. It was a pretty lengthy history, wasn't it?

A. Fairly lengthy, yes, sir.

Q. And to your knowledge – or you don't have any knowledge whether or not alcohol was involved in the vast majority of these offenses, do you, other than alcohol crimes like DUIs?

A. I don't know the exact number. I know that there are, let's see – there's a DUI charge in 84, there is another DUI charge in 84, the first one on the fourth

40

of July and the second one on the 31st of August. I know there is a possession of cocaine in 99. I know there's another DUI in 2001, a second offense of DUI in 2002, another DUI in Hancock County where he was convicted in 2003. So I know there are a number that are directly related to substance abuse. And during our evaluation of him he reported to us that many of these other offenses were substance related.

Then, the prosecutor asked Dr. Storer to relate the remainder of Evans's criminal history. From Evans's arrest record, Dr. Storer listed the dates of his arrest and/or conviction for a litany of offenses, which included multiple instances of fraud, larceny, probation violations, sale of stolen property, grand theft, passing worthless checks, vehicular theft, and obstructing justice.

¶73.　Evans did not object to this cross-examination. Because Evans failed to object, this issue is procedurally barred. *Williams v. State*, 684 So. 2d 1179, 1193 (Miss. 1996); *see also* n.6 *supra*. Procedural bar notwithstanding, Evans argues that the trial court plainly erred by failing *sua sponte* to limit the State's cross-examination regarding criminal history—a subject which Evans had introduced on direct examination. Evans now argues that the court erred by not intervening in the State's cross-examination because none of it was admissible to support the statutory aggravator on which the State relied, which was that "the capital offense was committed for pecuniary gain in the course of a robbery." Evans finally argues now—not then—that, if this Court deems the State's eliciting of the testimony to be impeachment, the impeachment exceeded the permissible scope of defense counsel's invitation.

¶74.　In *Quinn v. State*, 479 So. 2d 706, 708 (Miss. 1986), the defendant, on trial for sale of marijuana, denied that he had ever sold marijuana to anyone. The Court held that with this sweeping statement, Quinn had "opened the door" and that the prosecution was entitled to

41

show another sale of marijuana the accused had made some four days prior to the offense charged in the indictment. *Id.* We held the testimony admissible "for purposes of impeaching Quinn's credibility." *Id.*

¶75. We find that the State's cross-examination of Dr. Storer about Evans's criminal history clearly was to impeach the notion that Evans's criminal history revolved around alcohol or drug-related crimes. This impeachment did not exceed the invitation extended by Evans. On direct examination, Evans asked Dr. Storer if his criminal history primarily revolved around substance abuse. Dr. Storer replied, "[It] appear[s] to revolve primarily around substance abuse and substance abuse problems." On cross-examination, the State sought to introduce evidence inconsistent with the question and response, *i.e.*, to impeach Dr. Storer's testimony and to counter an inference that drugs or alcohol precipitated Evans's lengthy criminal history. Therefore, such impeachment was not a manifest miscarriage of justice, and no plain error occurred.

V. WHETHER EVANS'S CONVICTION MUST BE REVERSED BECAUSE OF THE PROSECUTOR'S MISCONDUCT OF MAKING CONSTITUTIONALLY IMPROPER AND PREJUDICIALLY INFLAMMATORY CLOSING ARGUMENT.

¶76. Evans alleges three instances of prosecutorial misconduct occurred during the rebuttal portion of the prosecutor's sentencing-phase closing arguments. First, he complains of the following argument:

> Ladies and gentlemen, I know it's been a long week and you have been through a lot and I don't need to stand before you and recount that last day that Wenda Holling experienced, but as I sat here and I listened to Mr. Burrell talk about the last images of her life, the last thing she saw was this defendant, I couldn't help but go back in my mind and wonder one thing. What were her

42

thoughts at that time? So much yesterday we spent talking about this defendant, his life, but what were hers at the age of 70 as the breath left her body in the last moments that day. What were her thoughts of John, of Barbara, her family, or even the defendant asking why, how could you. I took you into my home.

. . .

Even today, all this time, he presents to you hollow promises, just like he did back then. He asked you for mercy. What mercy did he show Wenda Holling? What mercy did he show her family when he publicized their mother's death for all of South Mississippi to read about. What mercy did he show today?

¶77. Evans argues that the first quoted portion of the closing argument contained an improper golden-rule argument, and in the second quoted portion, the prosecutor erred by stating that Evans had asked for mercy and commenting on Evans's failure to testify at the sentencing hearing.

¶78. Because Evans did not object during the prosecutor's closing arguments, his arguments are procedurally barred on appeal. *Williams*, 684 So. 2d at 1193. But "[w]e repeatedly have provided that, though the failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument, we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion." *O'Connor v. State*, 120 So. 3d 390, 399 (Miss. 2013). We must determine whether the alleged prosecutorial misconduct was so inflammatory that the trial judge should have intervened.

¶79. "Attorneys are to be given wide latitude in making their closing arguments." *Jimpson v. State*, 532 So. 2d 985, 991 (Miss. 1988). But a golden-rule argument, which asks the jurors to put themselves in the place of one of parties, is impermissible. *Holliman v. State*, 79 So. 3d 496, 500 (Miss. 2011). Evans argues that the prosecutor's speculation about the thoughts

43

that might have gone through Holling's mind improperly invited the jury members to place themselves in Holling's position. He contends that the argument was the equivalent of the improper argument in **Holliman**. But in **Holliman**, this Court reversed because the prosecutor, *over objection*, repeatedly asked the jurors to imagine how they would feel if a loaded shotgun were pointed in their faces. *Id.* at 499-500. Thus, in **Holliman**, the prosecutor explicitly violated the prohibition on golden-rule arguments by repeatedly asking the jurors to put themselves in the place of the victim. While the prosecutor's argument in the instant case approaches a golden-rule violation, the argument was not so inflammatory as to have required intervention by the trial court. Thus, no plain error occurred.

¶80.    Evans also argues that the prosecutor's comment that, though Evans had asked for mercy, he had not shown mercy was error. Evans argues that he never asked for mercy. He points out that *The Sun Herald* article submitted by the defense shows that, to the contrary, he wanted to be punished for his crime. Yet, in presenting mitigation evidence, Evans essentially was asking for relief or alleviation from the distress of the death penalty, *i.e.*, mercy.[11] Defense counsel's opening statement at the sentencing phase was, "We're going to be asking you for mercy to not give—not to vote to give Mr. Evans the death penalty." Evans admits that this Court has never addressed the question of whether a penalty-phase argument to show the defendant the same mercy as he showed the victim is per se improper. We find no plain error occurred.

---

[11] *See* Webster's II *New College Dictionary* 865 (2001). *See also* Webster's II *New College Dictionary* 208 (2001) (defining clemency as "mercy, especially toward an offender or enemy").

¶81. Finally, Evans argues that, when the prosecutor asked, "What mercy did he show today," the prosecutor directly commented on Evans's silence during the sentencing phase. "[T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). A direct comment on the defendant's failure to testify is impermissible, as is referring to the failure to testify "by innuendo and insinuation." *Jimpson*, 532 So. 2d at 991. However, it is proper to comment on the lack of a successful defense. *Id.*

¶82. "A comment violates the Fifth Amendment if the language used 'was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *U.S. v. Cervantes*, 706 F.3d 603, 614 (5th Cir. 2013). "The comment must have a clear effect on the jury to warrant reversal, and the doctrine of harmless error applies: an otherwise impermissible comment will not require reversal if it did not contribute to the jury's verdict beyond a reasonable doubt." *Id.*

¶83. Evans argues that, by asking what mercy he had shown "today," the prosecutor could have been referring only to Evans's failure to testify at the sentencing phase. The jury was instructed at the guilt phase not to draw unfavorable conclusions from the fact that Evans did not testify, but it was not so instructed at the sentencing phase. The jury is presumed to follow the instructions given by the trial court. "To presume otherwise would be to render the jury system inoperable." *Pitchford v. State*, 45 So. 3d 216, 240 (Miss. 2010). The State's

case was based on one aggravator, which was that "the capital offense was committed for pecuniary gain in the course of a robbery." The evidence from the guilt phase, reintroduced at the sentencing phase, included Evans's confession that the motive for the killing was robbery for pecuniary gain. This evidence conclusively established this aggravator. Furthermore, Evans's mitigating evidence was meager.[12] He primarily relied on the testimony of the psychologists to establish a troubled childhood, mental problems, and substance abuse. The State sought to cast doubts on the psychologists' relating of Evans's history by establishing their inability to corroborate what Evans had told them in his interviews.

VI.      WHETHER THE TRIAL COURT DEPRIVED EVANS OF HIS CONSTITUTIONAL RIGHTS AT THE GUILT PHASE BY REFUSING HIS REQUESTED MANSLAUGHTER INSTRUCTIONS AND GRANTING THE STATE'S REQUESTED INSTRUCTIONS ON ONE CONTINUOUS TRANSACTION AND VOLUNTARY INTOXICATION.

*A.      Whether the trial court erred by refusing Evans's proffered instructions on heat-of-passion manslaughter.*

¶84.    Evans requested jury instructions on heat-of-passion manslaughter, but the trial court denied the instructions, finding Evans had offered no evidence to support them. Now Evans contends that the denial of those instructions denied him a constitutional right to present his theory of the case.

> The standard of review for challenges to jury instructions is as follows: Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which

---

[12]Assuming, *arguendo*, that error occurred, it was harmless given the facts of this case, for we cannot firmly conclude it contributed to the verdict beyond a reasonable doubt.

incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Agnew v. State*, 783 So. 2d 699, 702 (Miss. 2001) (citations omitted). Manslaughter is a lesser-included offense of capital murder. Miss. Code Ann. § 97-3-19(3) (Rev. 2014). Section 97-3-35 codifies the crime of manslaughter and provides that "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-3-35 (Rev. 2014). "Heat of passion" has been defined as:

> [a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*McCune v. State*, 989 So. 2d 310, 319 (Miss. 2008) (quoting *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001)).

¶85. Evans argues that the trial court erred in finding no evidentiary support for his proffered heat-of-passion manslaughter instructions. He contends that his February 18, 2010, confession, in which he stated that he killed Holling after she had caught him stealing her credit card, provided an evidentiary basis for a jury finding of heat-of-passion manslaughter. The trial court found that the statement did not disclose an immediate and reasonable provocation. Indeed, in the statement, Evans indicates that, after he and Holling had argued, he had decided to kill Holling by smothering her. And when that was not effective, he had

47

strangled her. This argument completely ignores evidence regarding his plan to kill Holling that he hatched two weeks before the murder.

¶86.    Furthermore, nothing indicates or even hints that Evans's passion or anger was aroused by immediate and reasonable provocation. The fact that there was evidence that he and Holling had an argument is insufficient. *Phillips v. State*, 794 So. 2d 1034, 1038-39 (Miss. 2001). The record reveals the opposite. It is "clear that the decedent was [killed] with malice or deliberate design," which obviates the necessity of a manslaughter instruction. *Simmons v. State*, 805 So. 2d 452, 474 (Miss. 2001). We find that the trial court did not abuse its discretion by denying Evans's instructions on heat-of-passion manslaughter.

> B.      *Whether the trial court constitutionally erred by granting the State's requested voluntary-intoxication instruction.*

¶87.    The trial court granted the following instruction on voluntary intoxication at the State's request:

> The Court instructs the jury that if a Defendant, when sober, is capable of distinguishing between right and wrong, and the Defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated by use of alcohol and commits an offense while in that condition, he is criminally responsible for such acts.
>
> Therefore, if you find from the evidence in this case beyond a reasonable doubt that the Defendant, TIMOTHY NELSON EVANS[,] was capable of distinguishing between right and wrong at the time of the alleged offense and that he voluntarily deprived himself of the ability to distinguish between right and wrong by becoming intoxicated by use of alcohol and while in that condition committed the offense of Capital Murder, then he is criminally responsible for that act, and in such event you should find the Defendant guilty as charged.

The trial court granted the instruction over Evans's general objection after finding that evidence had been presented that Evans was intoxicated at the time of the murder and that this evidence was a part of Evans's defense strategy.

¶88. Evans argues that granting the instruction was error because, although he elicited testimony about his intoxication on the day of the crime on cross-examination and highlighted it in closing arguments, he never claimed that his intoxication exonerated him from all criminal responsibility. It is well-established that voluntary intoxication does not negate criminal liability. *Abeyta v. State*, 137 So. 3d 305, 312 (Miss. 2014). A voluntary-intoxication instruction is proper when the issue of intoxication is before the jury. *Davis v. State*, 684 So. 2d 643, 653 (Miss. 1996). The record clearly supports the trial court's ruling that evidence of Evans's intoxication had been presented. Evans repeatedly emphasized his intoxication during cross-examination and in closing arguments and sought to use his intoxication to undergird his defense. We find no abuse of discretion in the granting of the voluntary-intoxication instruction.

> C. *Whether the trial court erred by granting the State's jury instruction on the one-continuous-transaction rule.*

¶89. Evans complains that the trial court erred by granting a "one-continuous-transaction" jury instruction. This instruction stated that "[t]he Court instructs the jury that a killing occurring while engaged in the commission of a robbery includes the actions of the defendant leading up to the robbery, the occurrence of the robbery, and the aftermath of the robbery." Evans did not object to the instruction. "[I]n order to preserve a jury instruction issue for appellate purposes, a defendant must make specific, on-the-record objections to proposed

instructions." ***Young v. State***, 119 So. 3d 309, 314 (Miss. 2013). Evans's failure to object renders this issue procedurally barred.

¶90.    Procedural bar notwithstanding,[13] the issue is without merit. Evans contends that the one-continuous-transaction doctrine impermissibly allows a felony-murder conviction based on mere temporal proximity between a homicide and one of the felonies listed in the capital-murder statute, violating the Sixth and Fourteenth Amendments.

¶91.    In ***Turner v. State***, the Court explained that the one-continuous-transaction doctrine applies to felony-murder cases and defines the causal nexus required between the killing and the underlying felony. ***Turner***, 732 So. 2d 937, 950 (Miss. 1999). The Court held that "a killing occurring while engaged in the commission of one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." ***Id.*** "In other words, 'where the two crimes [e.g., murder and robbery] are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained.'" ***Gillett v. State***, 56 So. 3d 469, 492 (Miss. 2010) (quoting ***Pickle v. State***, 345 So. 2d 623, 627 (Miss. 1977)).

¶92.    Turner argued that because he killed the victim outside a store before his accomplice entered the store to rob it meant the killing did not occur while in connection to the robbery. ***Turner***, 732 So. 2d at 949. The Court rejected that argument: "Applying one continuous transaction rationale to the evidence in the present case, the actions of Turner were all related to, and motivated by his desire to rob someone . . . . Therefore, the time of death of [the

---

[13]*See* n.6 *supra*.

50

victim]—be it before or after the money was taken—is irrelevant." *Id.* at 950. Evans's argument thus has been considered and rejected by this Court. Moreover, because Evans admitted that he killed Holling in order to take her credit card, no concern exists that the evidence was such that the jury only could have found him guilty of capital murder based upon temporal proximity. Therefore, the granting of the instruction was not plain error.

VII. WHETHER THE SENTENCING-PHASE INSTRUCTIONS REQUIRE VACATION OF THE DEATH SENTENCE AND REMAND FOR A NEW SENTENCING PROCEEDING.

A. *Whether the jury instruction on the aggravator was erroneous.*

¶93. Evans contends that instructing the jury on the sole aggravator in this case, that "the capital offense was committed for pecuniary gain during the course of a robbery," was erroneous. Again, Evans did not object to the instruction at trial and is procedurally barred from raising the issue on appeal. *See supra* ¶¶ 89-90. Procedural bar notwithstanding, Mississippi Code Section 99-19-101(5) lists the statutory aggravators on which the jury may be instructed at the sentencing phase. The aggravator on which the jury was instructed in this case is an amalgam of two aggravators: "[t]he capital offense was committed while the defendant was engaged . . . in the commission of . . . any robbery . . . ." and "[t]he capital offense was committed for pecuniary gain." Miss. Code Ann. § 99-19-101(5)(d) and (f) (Rev. 2015). Evans contends that the State must select only one of these aggravators and that the amalgam instruction was error. But this Court approved the amalgam instruction in *Howell v. State*, 860 So. 2d 704, 756 (Miss. 2003), and *Turner*, 732 So. 2d at 954-55. Thus, the instruction was proper and this issue is without merit.

51

*B.     Use of the same robbery to capitalize the homicide and as an aggravator violated the Eighth Amendment.*

¶94.    Next, Evans argues that using the same facts to both capitalize and aggravate violates the Eighth Amendment's prohibition on arbitrary and capricious executions. We consistently have rejected this argument. *See **Batiste v. State***, 121 So. 3d 808, 869 (Miss. 2008); ***Gillett***, 56 So. 3d at 510. "The United States Supreme Court has held that use of an underlying felony as an aggravator is not a constitutional error." ***Moffett v. State***, 49 So. 3d 1073, 1116 (Miss. 2010) (citing ***Tuilaepa v. California***, 512 U.S. 967, 971-72, 114 S. Ct. 2630, 2634-35, 129 L. Ed. 2d 750 (1994); ***Lowenfield v. Phelps***, 484 U.S. 231, 233, 108 S. Ct. 546, 548, 98 L. Ed. 2d 568 (1988)).

*C.     Whether the trial court's sua sponte change to instruction D-17 violated Evans's right to have the jurors individually weigh mitigation.*

¶95.    Evans tendered jury instruction D-17, which stated:

> Mitigating circumstances differ from aggravating circumstances because you are not required to be convinced beyond a reasonable doubt that a mitigating circumstance exists before you *must* take that circumstance into account as you deliberate this case. You *must* consider a mitigating circumstance if you believe that there is any evidence to support it. Neither are you bound to all agree on the existence of a mitigating circumstance, as you are with an aggravating circumstance. To the contrary you *must* – as an individual juror – find a mitigating circumstance to be present if you believe there is any evidence to support it, even if one or all of the other jurors disagree with you. This is a wholly individual decision on your part. Each juror *must* consider every mitigating factor that he or she individually finds to exist. (Emphasis added.)

The State objected to the instruction on the ground that it was covered by another instruction. The trial court raised a "question with regard to the mandatory language of this instruction, which says . . . you must consider it if you believe there is any evidence to support it. You

52

must find a mitigating circumstance. I don't know of any case law that requires that you mandate that they consider it." Defense counsel offered to change "must" to "may" whenever it appeared in the instruction, and the instruction was given as modified.

¶96.    Evans argues that the trial court erred by *sua sponte* reforming the instruction because this "must" language was approved in **Blue v State**, 674 So. 2d 1184, 1226-27 (Miss. 1996), *overruled on other grounds by* **King v. State**, 784 So. 2d 884 (Miss. 2001). In **Blue**, this Court approved the following mitigation instruction, although it found the instruction unnecessary in that case because it was fairly covered by other instructions:

> you, as individual jurors, must consider mitigating circumstances. Therefore, even if all other eleven jurors find that a certain mitigating circumstance does not exist, if you believe it does exist, you must find that mitigating circumstance, and weigh it in your further deliberations.

*Id.* at 1226. A comparison of the jury instruction in **Blue** and D-17 indicates that the two are not identical. Instruction D-17 informed the jurors that, if one juror found any evidence of a mitigating circumstance, that juror must find the mitigating circumstance to be present. The instruction in **Blue** stated that an individual juror must find any mitigating circumstance that juror believes to exist even if the other eleven jurors do not find that it exists. Evans cites no law supporting his argument that the "must" language in D-17 was a correct statement of the law. We find no error in the trial court's reformation of D-17.

> D.    Whether the trial court erroneously instructed the jury that the sentencing verdict had to be unanimous.

¶97.    Without objection from Evans, the trial court instructed the jury that "in order to return a sentencing verdict it will be necessary that each juror agree thereto. In other words,

53

all twelve jurors must agree on a verdict in this case." Evans now argues this instruction was erroneous because a unanimous verdict was not required to sentence him to life imprisonment if the jury was unable to agree. Evans's failure to object renders this issue procedurally barred. *See supra* ¶¶ 89-90.

¶98. Procedural barr notwithstanding, Mississippi Code Section 99-19-103 sets out three sentencing options: (1) death; (2) life imprisonment, or (3) unable to agree unanimously. Miss. Code Ann. § 99-19-103 (Rev. 2015). The jury's long-form instruction properly instructed it about the three options.

¶99. This Court reads the jury instructions as a whole and, "[w]hen so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Edwards v. State*, 737 So. 2d 275, 305 (Miss. 1999). The long-form instruction told the jury that, to return the death penalty, it had to (1) unanimously find one of the *Enmund*[14] factors, (2) unanimously find the aggravating factor, and (3) find that the mitigating circumstances did not outweigh the aggravating circumstance. The instruction provided a form for making these findings, telling the jury that it could return a verdict of life imprisonment without parole. It also provided that the jury could inform the court, by the foreman's signing the form, that it was unable to agree on punishment. Nor was the judge's instruction regarding a unanimous sentence erroneous. If the jury failed to agree unanimously to sentence Evans to either death or life imprisonment, it was to return a verdict that it was unable to agree. Regardless of the division on punishment, an "unable-to-agree" verdict is

---

[14] *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982).

a unanimous agreement to disagree. Thus, the jury instructions, read as a whole, correctly informed the jury of its required findings at sentencing.

VIII. WHETHER THE DEATH SENTENCE WAS IMPOSED IN VIOLATION OF THE UNITED STATES CONSTITUTION.

A. *Whether Mississippi's death-penalty scheme is generally unconstitutional*.

¶100. Evans "seeks to have this Court revisit the question of whether Mississippi's death penalty – whether piecemeal or *in toto* – can survive Eighth Amendment scrutiny." Because this Court has upheld the constitutionality of this state's death penalty against numerous challenges, we find that Evans is entitled to no relief on this issue. *See*, *e.g.*, **Corrothers v. State**, 148 So. 3d 278, 322-23 (Miss. 2014); **Batiste v. State**, 121 So. 3d 808, 872 (Miss. 2013); **Brown v. State**, 890 So. 2d 901, 921 (Miss. 2004); **Walker v. State**, 863 So. 2d 1, 28-30 (Miss. 2003); **Puckett v. State**, 737 So. 2d 322, 363-64 (Miss. 1999).

B. *Whether the Mississippi capital sentencing statute, which permits a jury to make factual findings justifying a death sentence in the absence of proof beyond a reasonable doubt, violates the Sixth Amendment.*

¶101. Last year, the United States Supreme Court decided **Hurst v. Florida**, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016). In **Hurst**, the Supreme Court determined that Florida's capital sentencing scheme violated **Ring v. Arizona**, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). **Ring** "held that capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." **Hurst**, 136 S. Ct. at 620 (quoting **Hurst v. State**, 147 So. 3d 435, 445 (Fla. 2014)). **Ring** invalidated Arizona's sentencing scheme, under which a judge, not a jury, independently found an aggravating circumstance and sentenced Ring to death. **Hurst**, 136 S. Ct. at 621 (citing **Ring**,

536 U.S. at 591-93). *Hurst* invalidated Florida's sentencing scheme because it required a judge, independent of the findings of an advisory jury, to find the existence of an aggravating circumstance, in violation of *Ring*. *Hurst*, 136 S. Ct. at 619-20.

¶102. Evans argues that Mississippi's death-penalty statute, which allows the jury to impose a death sentence by finding that "sufficient aggravating circumstances exist . . . and [t]hat there are insufficient mitigating circumstances . . . to outweigh the aggravating circumstances" is unconstitutional because the statute does not prescribe any burden of proof. Miss. Code Ann. § 99-19-101(2) (Rev. 2015). Evans argues that, after *Hurst*, the jury must make a finding that there are insufficient mitigating circumstances to outweigh the aggravating circumstances beyond a reasonable doubt. He argues that, under *Hurst*, because the statute does not require beyond-a-reasonable-doubt findings, it violates the Fifth and Sixth Amendments. In its response, the State contends that *Hurst* did not "emphasize or require that findings of fact be made beyond a reasonable doubt."

¶103. In *Brown v. State*, 890 So. 2d 901, 921 (Miss. 2004), this Court was confronted with the argument Evans makes today. We rejected that argument. We held that "the rule of this Court is that the jurors are required to find the existence of each aggravating circumstance beyond a reasonable doubt, but the jury is not required to find that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating circumstances following the statute." *Id.* The Court found that, because Mississippi's sentencing scheme requires the sentence to be determined by a jury, not by a judge, *Apprendi*[15] and *Ring* were not violated.

---

[15] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

*Id.* In other words, the Court held that the "beyond a reasonable doubt" requirement does not apply to the determination that the aggravating circumstances outweigh the totality of the mitigating circumstances. *Id.*

¶104. Although Evans argues that *Hurst* broadened the applicability of *Apprendi* and *Ring*, *Hurst* merely applied *Ring* to Florida's sentencing scheme. *Hurst* clearly applied *Ring*'s holding that "capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." *Hurst*, 136 S. Ct. at 620 (quoting *Hurst*, 147 So. 3d at 445). The *Hurst* decision did not rest upon or even address the beyond-a-reasonable-doubt standard. Therefore, under *Brown*, this issue is without merit.

> C.  Whether the failure to include aggravating circumstances in the indictment renders the sentence unconstitutional.

¶105. Evans argues that, because the aggravating circumstance was not included in his indictment, his conviction must be reversed under *Ring* and *Apprendi*. He admits that this Court already has decided this issue adversely to him, but he argues that these decisions are erroneous in light of *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). We rejected an identical argument in *Corrothers v. State*, where we found this issue to be without merit:

> Finally, Corrothers argues that Mississippi's capital sentencing scheme is indistinguishable from that in *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), and, therefore, the position that *Ring v. Arizona* has no application to Mississippi's scheme is incorrect. We rejected this argument in *Batiste*, holding that, because *Marsh* did not address the requirements for indictments, it did not alter our interpretation of *Apprendi* and *Ring*. *Batiste*, 121 So. 3d at 871. This issue is without merit.

*Corrothers*, 148 So. 3d at 322.

D. *Whether the scienter provisions of Mississippi's capital-sentencing scheme are unconstitutional and void.*

¶106. Evans argues that Mississippi Code Section 99-19-101(7)(d) is unconstitutional under ***Enmund v. Florida***, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), and ***Tison v. Arizona***, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987),which require that, to be sentenced to death, a person convicted of capital murder must have actually killed, attempted to kill, or intended to kill. Evans contends that Section 99-19-101(7)(d) unconstitutionally adds a fourth basis, which is that the defendant contemplated that lethal force would be employed. In ***Corrothers***, we rejected this argument, holding:

> "This Court has repeatedly held that 'Mississippi's capital sentencing scheme, as a whole, is constitutional.'" ***Stevens v. State***, 806 So. 2d 1031, 1052 (¶ 92) (Miss. 2001) (quoting ***Woodward v. State***, 726 So. 2d 524, 528 (Miss. 1997)). "The State must only prove one of the four facts. It is not necessary that the State prove intent where the victim was actually killed." ***Id.*** at 1053 (¶ 99). Here, the trial court properly instructed the jury as to the findings necessary to impose a sentence of death based on state law. According to precedent, Mississippi's capital-sentencing scheme is constitutional. Therefore, this issue is without merit.

***Corrothers***, 148 So. 3d at 322.

E. *Whether Mississippi's death-penalty scheme is unconstitutional for additional reasons.*

¶107. Evans argues that the death penalty is being applied in a discriminatory and irrational manner because it has been applied disproportionately against poor persons and those accused of killing white victims. But we have rejected that argument as well. *See **Corrothers***, 148 So. 3d at 322. The record reveals that both Evans and Holling were white. It should not come as a surprise that many convicted murderers on death row were convicted of killing

white victims, when one considers that since 2002, fourteen of Mississippi's seventeen executions by lethal injection were white defendants.[16] We also have rejected Evans's arguments that our death-penalty statutes are overbroad and vague, and that they are unconstitutional because they do not authorize the death penalty for simple murder, no matter how premeditated or atrocious. ***Corrothers***, 148 So. 3d at 322. And we have rejected Evans's argument that our statutory scheme does not provide for meaningful appellate review. ***Batiste***, 121 So. 3d at 872.

> IX.  WHETHER EVANS'S DEATH SENTENCE IS CONSTITUTIONALLY AND STATUTORILY DISPROPORTIONATE, WHETHER THERE WAS SUFFICIENT EVIDENCE TO ENABLE THE JURY TO FIND THE AGGRAVATOR WAS SUPPORTED BY SUFFICIENT EVIDENCE, AND WHETHER THE SENTENCE OF DEATH WAS IMPOSED UNDER THE INFLUENCE OF PASSION, PREJUDICE, OR ANY OTHER ARBITRARY FACTOR.

¶108. Mississippi Code Section 99-19-105(3) directs that this Court undertake review of the following matters when a death sentence has been imposed:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
>
> (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
>
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

---

[16]*See* Mississippi and the Death Penalty, Mississippi Department of Corrections (2017), http://www.mdoc.ms.gov/Death-Row/Pages/Mississippi-Death-Penalty.aspx (last visited June 1, 2017).

(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(3) (Miss. 2015).

¶109. Evans argues that the death sentence was disproportionate to other sentences in similar cases. He argues that, in conducting proportionality review, this Court must consider not only cases in which the death sentence was imposed, but also cases in which it was not imposed. We already have rejected this argument. *See Lester v. State*, 692 So. 2d 755, 802 (Miss. 1997), *overruled on other grounds by Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999) ("We hold that the current guidelines are sufficiently specific, and we find no reason to undertake the overwhelming task of considering all death eligible cases in our review."). And this Court has upheld sentences of death for capital murder with the underlying felony of robbery. *Corrothers*, 148 So. 3d at 325; *Batiste*, 121 So. 3d at 873; *Gillett*, 56 So. 3d at 524; *Doss v. State*, 709 So. 2d 369, 401 (Miss. 1997). We find no disproportionality.

¶110. Evans also contends that the death sentence was imposed arbitrarily and that the jury did not afford sufficient weight to his alleged mental-health issues. He argues that the evidence suggests he is not someone whose "extreme culpability" makes him the "most deserving of execution." *Roper v. Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (holding that "[c]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution") (internal citations omitted). He cites *Edwards v. State*, 441 So. 2d 84 (Miss. 1983), in which this Court reversed a sentence of death imposed

60

on a defendant with a long history of schizophrenia. However, a majority of the Court did not agree on the reason for reversing the sentence.

¶111. We find that the evidence presented at the sentencing hearing does not establish that Evans suffered from mental-health problems as serious as the defendant's in *Edwards*. Dr. Storer diagnosed Evans with alcohol dependence and an anxiety disorder. Dr. Zimmerman diagnosed him with substance abuse or addiction, and an anxiety disorder. Dr. Zimmerman also diagnosed a cognitive disorder, testifying that Evans was under the influence of extreme mental and emotional disturbance at the time of the crime, but Dr. Storer expressed uncertainty about Zimmerman's opinions. As to his culpability, Evans admitted that he had planned the killing in advance and that he ultimately executed the plan and a seventy-year-old woman who had befriended him. He admitted that, as he strangled Holling, he had second thoughts, but he cast them aside—as he later cast her aside after partying (as planned) that night. He followed his plan to a "T," but for tossing Holling's body in the brush along the highway rather than burying her as he originally planned. The record does not reflect that his sentence of death was the result of passion, prejudice, or any other arbitrary factor.

¶112. The jury found the sole aggravator, that "the capital offense was committed for pecuniary gain during the course of a robbery." The crime of robbery has three elements: "(1) [f]elonious intent; (2) [f]orce or fear as a means of effectuating that intent; and (3) [b]y that means taking and carrying away the property of another from his person or presence." *Harper v. State*, 434 So. 2d 1367, 1368 (Miss. 1983). The jury was presented with Evans's own words that he had planned to kill and killed Holling for the purpose of taking her credit

61

card. Evidence revealed that, after Evans killed Holling, he used her credit card to obtain goods and services at several locations and went out partying. The next day, he took steps to cover up his crime. We find that the aggravator was supported by the evidence.

X. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS IN THIS CASE REQUIRES REVERSAL OF THE CONVICTION AND/OR SENTENCE.

¶113. Evans argues that, even if no error occurred or if this Court deems errors harmless, this Court should consider reversing based on cumulative error. This Court has held that "individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (Miss. 2007). That conclusion is without merit, for we find no errors occurred. Thus, there can be no cumulative error. *See Harris v. State*, 970 So. 2d 151, 157 (Miss. 2007).

## <u>CONCLUSION</u>

¶114. For the reasons stated, we affirm Evans's conviction and sentence of death.

¶115. **AFFIRMED.**

**WALLER, C.J., MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. COLEMAN, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., MAXWELL AND CHAMBERLIN, JJ.; WALLER, C.J., JOINS IN PART. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.**

**COLEMAN, JUSTICE, CONCURRING:**

¶116. I concur with the entirety of the majority's opinion. However, I write separately to express my opinion that the record shows that Evans clearly received a Rule 9.06 hearing.

¶117. Pursuant to Mississippi Uniform Rule of Circuit and County Court Practice 9.06, after the ordered mental examination, "the court shall conduct a hearing to determine if the defendant is competent to stand trial." As described in both the majority and dissenting opinions, a hearing was had wherein the trial judge inquired as to Evans's competency to stand trial and was told by defense counsel that Evans was competent.

¶118. At the risk of stating the obvious, a hearing is simply a "judicial session, [usually] open to the public, held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying. . . ." *Hearing*, Black's Law Dictionary (10th ed. 2014). Rule 9.06 prescribes no requirements for the requisite hearing; it mandates only that "a hearing" occur. The record in the instant case could not more clearly demonstrate that a proceeding occurred, in open court, wherein the trial judge inquired into an issue of fact – the competency of Evans.

¶119. I pause before concluding to ruminate upon what effect requiring further proceedings relevant to Evans's competency would mean to a defense attorney placed in the position in which Evans's attorney found himself. Lawyers are required by the rules of the profession to be honest with the courts before which they appear. Miss. R. Prof'l Conduct 3.3. "[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Comment to Miss. R. Prof'l Conduct 3.3. In the circuit court, Evans's attorney was called upon to make a statement to the court regarding whether an issue as to his client's

competence existed. The ethics of the profession required him to answer honestly. I cannot understand how the Supreme Court could consider faulting the trial court for not holding a larger hearing than that which was held. To do so would be to flirt with the assumption that Evans's attorney should have violated his ethical duty and been less than forthright with the trial court.

**RANDOLPH, P.J., MAXWELL AND CHAMBERLIN, JJ., JOIN THIS OPINION. WALLER, C.J., JOINS THIS OPINION IN PART.**

**KITCHENS, JUSTICE, DISSENTING:**

¶120. Because our precedent firmly establishes that the trial court's failure to afford Evans a mental competency hearing is reversible error, I respectfully dissent. Further, I would find that the trial court committed error during *voir dire* examination by preventing Evans's counsel from ascertaining the prospective jurors' ability to consider alcohol abuse as mitigating. I also would find that the seating of an alternate juror in the sentencing phase of Evans's trial – who had not participated in guilt-phase deliberations – violated this State's capital sentencing scheme. Each of these errors requires reversal, most obviously the omission of the mandatory mental competency hearing. Accordingly, I would reverse and remand for a new trial.

> *A. Because the trial court ordered that Evans undergo a mental evaluation for competency, its failure to hold a competency hearing, followed by an adjudication of the question of Evans's competence, demands reversal.*

¶121. Approximately two months after Evans's indictment for capital murder, his appointed counsel filed a motion for a mental evaluation to determine whether Evans knew right from wrong at the time of the crime, whether he was mentally competent to stand trial, and to

64

identify possible mitigating circumstances. The trial court granted the motion and Evans's subsequent request to have the mental evaluation performed by Dr. Beverly Smallwood. After Dr. Smallwood reported that she was unable to perform the mental evaluation, on November 28, 2012, the trial court entered an amended agreed order that Evans receive a mental evaluation at the Mississippi State Hospital to determine, among other things, his competency to stand trial.

¶122. On January 18, 2013, the trial court was notified that Evans's mental evaluation had been completed and, shortly thereafter, the trial court held a hearing to inquire about the results of that mental evaluation. At the hearing, the following exchange occurred between Evans's counsel and the trial court:

> [Defense counsel]: Judge, Mr. Evans was seen at Whitfield, completed all of his evaluations and we have received the full report, the defense has received the full report and we are ready to move forward and we have come to an agreement on the trial date as well as on the nonevidentiary motion settings, the evidentiary motion setting and the omnibus hearing setting.
>
> . . .
>
> THE COURT:  Mr. Thriffiley, I know the primary reason for the evaluation had to do with some mitigation but also I presume since you're ready to move forward that it found Mr. Evans was competent both to assist his counsel as well as to proceed to trial.
>
> A. Yes, Your Honor.
>
> THE COURT: All right.

The discussion of the mental evaluation consisted of that brief exchange. Just before the trial, the matter of Evans's mental competence was revisited during an omnibus hearing. The following occurred:

65

> THE COURT: Defense, any claim of incompetency for the defendant to stand trial?

> Mr. Whittman: No, your honor.

The case proceeded to trial. The report of Evans's mental evaluation was not filed with the trial court, and its contents were not submitted for the trial court's consideration in any way. Thus, the trial court received no evidence and made no findings regarding Evans's mental competence to stand trial.

¶123. Evans argues that his conviction must be reversed due to the trial court's failure to hold a competency hearing, followed by an adjudication of his mental competence to stand trial. A criminal defendant has a federal constitutional due process right not to be tried while incompetent. *Pate v. Robinson*, 383 U.S. 375, 385, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). Our state Constitution also protects this right. *Williams v. State*, 205 Miss. 515, 524, 39 So. 2d 3, 4 (1949) (citing Miss. Const. art. 3, § 26). This right is "fundamental to an adversary system of justice." *Drope v. Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). The standard for competency to stand trial is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 788-89, 4 L. Ed. 2d 824 (1960). This Court has held that a mentally competent defendant is one:

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

66

*Hollie v. State*, 174 So. 3d 824, 830 (Miss. 2015) (quoting *Hearn v. State*, 3 So. 3d 722, 728 (Miss. 2008)).

¶124. The right not to be tried while incompetent is protected by Uniform Rule of Circuit and County Court Practice 9.06, which provides, in pertinent part, that:

> If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.
>
> *After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial.* If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial. If the court finds that the defendant is incompetent to stand trial, then the court shall commit the defendant to the Mississippi State Hospital or other appropriate mental health facility.

URCCC 9.06 (emphasis added). This Court has held that, under Rule 9.06, a trial court's order for the defendant to undergo a mental evaluation to determine competence "is a per se showing that the trial court had reasonable grounds to believe the defendant was incompetent to stand trial." *Hollie*, 174 So. 3d at 830. Therefore, we have held, "once a mental evaluation is ordered, a competency hearing is *mandatory*." *Id.* (emphasis added); *see also Smith v. State*, 149 So. 3d 1027, 1029 (Miss. 2014) (reversing for an evidentiary hearing on a post-conviction claim that a mental competency hearing should have been held after the trial court ordered a mental evaluation); *Beasley v. State*, 136 So. 3d 393, 398 (Miss. 2014) (the Court affirmed on the ground that an adequate competency hearing had been held after the mental evaluation); *Jay v. State*, 25 So. 3d 257, 262 (Miss. 2009) (the Court reversed because no

competency hearing had been held after the mental evaluation). Additionally, we have held that "the appropriate remedy for failure to hold a competency hearing is a new trial, not a retrospective competency hearing." *Smith*, 149 So. 3d at 1035 (citing *Coleman v. State*, 127 So. 3d 161, 168 (Miss. 2013)).

¶125. In *Hollie*, after the defendant had confessed to a capital murder and an armed robbery, his attorney filed a motion for a mental evaluation, which the trial court granted. *Id.* at 826. However, Hollie pled guilty to both crimes without a competency hearing or an adjudication of his mental status. *Id.* at 827. The state doctor's report of Hollie's mental evaluation was filed with the trial court, but never was offered or admitted into evidence. *Id.* At the sentencing hearing, Hollie instructed his attorney to present no defense, and the jury sentenced him to death. *Id.* This Court reviewed Hollie's death sentence as mandated by Mississippi Code Section 99-19-105(3) (Miss. 2015). *Id.* at 829. We held that the trial court had committed reversible error by ordering a mental evaluation but never holding a competency hearing. *Id.* at 832. We remanded the case for a competency hearing, to be followed by a trial if Hollie were found competent, or commitment to the Mississippi State Hospital or other appropriate mental health facility if he were found incompetent. *Id.* at 833-34.

¶126. The requirement that a competency hearing occur after a court-ordered mental evaluation had been established more than four years before Evans's trial. This Court held that, "when the evidence raises a sufficient doubt as to a defendant's mental ability to stand trial, that defendant is deprived of due process of law when the trial court does not, on its

own, conduct a separate competency hearing." *Sanders v. State*, 9 So. 3d 1132, 1135 (Miss. 2009) (citing *Pate*, 383 U.S. at 386). In *Sanders*, this Court recognized the constitutional requirement that "trial courts are obligated to conduct a competency hearing, either on the defendant's motion or *sua sponte*, if there is sufficient doubt about a defendant's competence." *Sanders*, 9 So. 3d at 1135 (quoting *House v. State*, 754 So. 2d 1147, 1151 (Miss. 1999) (citing *Drope*, 420 U.S. at 180, 95 S. Ct. 896)). And the Court held that sufficient doubt exists "once a trial court orders a psychiatric evaluation to determine competency to stand trial." *Sanders*, 9 So. 3d at 1136. Further, we held that the plain language of Rule 9.06 "requires an on-the-record hearing to determine competency once the court has reasonable ground to believe that the defendant is incompetent." *Id.* At this hearing, the trial court "shall" weigh the evidence and "shall" make its competency determination a matter of record. *Id.* (quoting URCCC 9.06).

¶127.  These cases pronounce in no uncertain terms what must occur when the trial court orders a mental evaluation to determine a defendant's competency to stand trial. Simply put, this Court has held that, once a mental evaluation has been ordered, a competency hearing is mandatory. *Hollie*, 174 So. 3d at 830. This is because an order for a mental evaluation "is a per se showing that the trial court had reasonable grounds to believe the defendant was incompetent to stand trial." *Id.* In this case, the trial court ordered a mental evaluation. Therefore, under Rule 9.06 and the clear prior holdings of this Court, a mental competency hearing and competency determination were mandatory, and because no competency hearing and competency determination occurred, this Court must reverse and remand for a new trial.

¶128. But instead of applying our clearly established precedent, the majority employs a smoke-and-mirrors approach to explain why no reversible error occurred. Initially, the majority states that "there was never a finding by the trial court that a 'reasonable ground to believe the defendant is incompetent' existed" under Rule 9.06. Maj. Op. at ¶ 24. But it has been the law in Mississippi since *Sanders* that an order for a mental evaluation to determine competency means that the trial court had "reasonable ground to believe the defendant is incompetent" under Rule 9.06. *Sanders*, 9 So. 3d at 1136. Without question, our precedent dictates that the need for a competency hearing followed by an on-the-record determination of mental competence is triggered by the trial court's order for a mental evaluation.

¶129. Next, the majority seems to hold that defense counsel's actions waived Evans's right to a competency hearing followed by a determination of the question of mental competence by the trial court. Then, the majority faults Evans for having failed to offer any evidence of mental incompetence. But a failure to offer any evidence of mental incompetence is exactly what would be expected of a defendant whose lawyer has foregone a competency hearing, whether wittingly or unwittingly. Moreover, this Court has held more than once that the competency hearing required by Rule 9.06 *cannot be waived*. Thus, no matter what Evans's counsel communicated to the trial court, the defense attorney was unable effectively to have waived Evans's right to a competency hearing and competency determination by the trial court. In *Hollie*, the State argued that Hollie was not entitled to a competency hearing because his guilty plea had waived his right to a competency determination. *Hollie*, 174 So. 3d at 831. Citing *Pate*, this Court rejected that argument, because a defendant's constitutional

70

rights are abridged by the failure to afford an adequate hearing on mental competence when a legitimate issue is raised. *Id.* The Court quoted *Pate* for the proposition that "[t]he United States Supreme Court has stated unequivocally that 'it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial.'" *Hollie*, 174 So. 3d at 831 (quoting *Pate,* 383 U.S. 375). We also recognized that, in *Sanders*, a majority of the Court rejected the view that the failure to object contemporaneously at trial waives the issue. *Id.* at 832. With respect, I believe the majority errs by finding that defense counsel waived a competency hearing and by faulting Evans for his failure to put on any evidence of incompetency; clearly, his counsel's actions foreclosed his ability to do so.

¶130. Paradoxically, the majority also makes several findings that the trial court actually adjudicated the issue of Evans's mental competence. How the trial court can be said to have made such an adjudication when Evans, according to the majority, had waived a competency hearing and competency determination is not readily apparent. Nevertheless, the majority finds that "the trial court deemed Evans competent," and that the trial court made a "determination of competency." Maj. Op. at ¶¶ 26, 29. But in reality, nothing of the sort occurred. The trial court simply accepted defense counsel's waiver after his declaration that, because the mental evaluation had found Evans competent, he would not pursue the issue. And we have found such a waiver to be ineffective. *Hollie*, 174 So. 3d at 831.

¶131. The majority also finds that, because the trial court on several occasions expressed concern about Evans's mental competence, but accepted defense counsel's supposed waiver

71

of a mental competency determination and proceeded to trial, there "is record evidence that the court deemed Evans competent." Maj. Op. at ¶ 29. But a trial court's ordering of a mental evaluation to determine competence, then proceeding to trial without a competency hearing, is precisely the error we identified, defined, and condemned in *Sanders*. The notion that simply proceeding to trial is the equivalent of an express determination that the defendant is competent to stand trial wholly obviates the requirements of Rule 9.06, and for all practical purposes overrules our decisions in *Hollie*, *Smith*, *Beasley*, *Coleman*, *Jay*, and *Sanders*. If the trial itself constituted record evidence of a mental competency determination, then this Court would have affirmed, rather than reversed, in our prior cases in which a mental evaluation was ordered, but the defendant was tried without a competency hearing.

¶132. In fact, the majority's finding that the trial court actually made a mental competency determination echos the State's argument on this issue. The State, in evident recognition of the mandatory nature of a competency hearing, characterizes what occurred at the pretrial hearings as a competency hearing. The State contends that, during those proceedings, defense counsel informed the trial court that the mental evaluation had found Evans competent, and the trial court implicitly adjudicated the issue of competency by allowing the case to proceed to trial. The State's argument is that "[d]efense counsel admitted Evans was competent, based on the results of the mental evaluation, which obviated the need for a more protracted or extensive hearing." The State argues that, "unlike *Hollie*, a hearing was held where the court acknowledged and defense counsel admitted Evans was competent to stand trial."

¶133. But the record reflects that the trial court accepted defense counsel's relinquishment of a competency determination after his oral representation to the court that the mental evaluation had found Evans competent to stand trial. The trial court weighed no evidence because there was none to weigh; the mental evaluation report never was filed with the court, was not admitted into evidence, and no testimony or other evidence concerning it was presented. The brief colloquy between the court and defense counsel in which the lawyer gave up his client's well-established right to a competency determination cannot, by any stretch of the mind, be characterized as a competency hearing followed by an adjudication of competence.[17] Considered objectively, the pretrial proceedings as a whole cannot be deemed a competency hearing followed by an adjudication of Evans's competence, or even as roughly equivalent thereto.

¶134. Further, the proceedings in this case cannot be characterized as a mental competency hearing, considering the history of competency hearings in this state. The issue of determining the defendant's competence to stand trial is a serious matter demanding focused attention by the trial court, so much so that, before our rules authorized the trial judge alone to make the determination of mental competence, the issue was determined in preliminary jury trials. In *Williams v. State*, 205 Miss. 515, 524-25, 39 So. 2d 3, 4 (1949), this Court held

---

[17] The requirement of Rule 9.06 that a mental competency hearing take place after the trial court orders a mental evaluation does not place defense counsel in the position of committing an ethics violation, as suggested by Justice Coleman. The rule does not mandate that defense counsel withhold the results of the mental evaluation from the trial court. In this case, after the trial court inquired about the status of the mental evaluation, defense counsel should have requested the competency hearing and competency determination required by the rule.

73

that the trial of a mentally incompetent defendant is a due process violation, adjuring that "We urge upon the trial courts to observe this constitutional right of defendants, with meticulous care, and submit to the jury, preliminarily, the issue of the defendant's sanity in all cases where there is a probability that defendant is incapable of making a rational defense." *See also Jaquith v. Beckwith*, 248 Miss. 491, 500, 157 So. 2d 403, 407 (1963) (holding that the issue of mental competence is determined by a jury prior to trial). This Court's adoption of rules directing the trial judge to determine the defendant's mental competence in no way diminished the requirement that the issue be determined with meticulous care.

¶135. The majority also finds that no competency hearing was required because "the purposes of Rule 9.06 were satisfied." In *Hearn v. State*, 3 So. 3d 722, 730 (Miss. 2008), this Court found that the purposes of Rule 9.06 were satisfied because, although no competency hearing occurred, one of Hearn's examining physicians had testified at trial about Hearn's competency and was cross-examined by Hearn's counsel. In those particular circumstances – very unlike those in the present case – we held that the failure to hold a competency hearing after the trial court had ordered a mental evaluation was not reversible error. *Id. Hearn* was decided before *Sanders* and, although it has not been overruled specifically, it has been distinguished in every subsequent case on this issue decided by this Court.

¶136. Prior to today's decision, this Court treated *Hearn* as a narrow exception to the rule that Rule 9.06 mandates a competency hearing after the court has ordered a mental competency evaluation. The facts of this case do not parallel those in *Hearn*. Hearn was

74

evaluated for competency at the State Hospital pursuant to a court order and found competent. *Hearn*, 3 So. 3d at 729. The physician who performed the evaluation testified at Hearn's trial that Hearn was competent to stand trial, and the doctor was subjected to cross-examination about his findings. *Id.* at 730. Thus, defense counsel was able, through cross-examination, to explore thoroughly the issue of Hearn's mental competence before the trial court. Although the trial court made no competency determination, the Court held that "the purposes of Rule 9.06 were satisfied" under the circumstances. *Id.* Thus, *Hearn* stands for the limited proposition that "the purposes of Rule 9.06 [are] satisfied" when the physician who performed the mental evaluation testifies at trial that the defendant was found competent and the physician is subjected to cross-examination.

¶137. In this case, nothing remotely similar occurred. As the majority recognizes, the examining psychologist, Dr. R.M. Storer, provided testimony at Evans's sentencing hearing about some aspects of Evans's mental competency evaluation. But Dr. Storer never testified that Evans had been found mentally competent to stand trial. And Dr. Storer did not testify at all during the guilt phase of the trial. Unlike in *Hearn*, Evans had been tried and found guilty by the time Dr. Storer provided any testimony bearing upon his mental competence. A psychologist's testimony at a sentencing trial, after guilt has been determined, falls woefully short of fulfilling the purposes of Rule 9.06, especially in light of the fact that the mental evaluation report was not admitted during any of the proceedings in this case.

¶138. When compared to our prior cases, rather than its paralleling *Hearn*, this case is most similar to *Hollie*. As in this case, the trial court in *Hollie* ordered a mental evaluation on

motion of defense counsel. *Hollie*, 174 So. 3d at 826. As in this case, the report of the mental evaluation was not admitted into evidence before the trial court.[18] *Id.* at 832. As in this case, no mental competency hearing occurred, and the trial court never made an on-the-record determination that Hollie was mentally competent to stand trial. *Id.* at 826. And, as in this case, Hollie was convicted and sentenced to death without ever having had the issue of his mental competence determined on the record after a weighing of the relevant evidence. *Id.* But in *Hollie*, this Court deemed this omission to be reversible error. *Id.*

¶139. Finally, the denial of a competency hearing in this case is fraught with constitutional implications. "[W]hen the evidence raises sufficient doubt as to a defendant's mental ability to stand trial, that defendant is deprived of due process of law when the trial court does not, on its own, conduct a separate competency hearing." *Sanders v. State*, 9 So. 3d at 1135 (citing *Pate*, 383 U.S. at 386). We have recognized the constitutional requirement that "trial courts are *obligated* to conduct a competency hearing, either on the defendant's motion or *sua sponte*, if there is sufficient doubt about a defendant's competence." *Sanders*, 9 So. 3d at 1135 (quoting *House v. State*, 754 So. 2d 1147, 1151 (Miss. 1999) (citing *Drope*, 420 U.S. at 180, 95 S. Ct. 896)).

---

[18] Unlike in this case, the report of Hollie's mental evaluation finding him competent was included in the appellate record. But this Court held that appellate review of a mental evaluation report is no substitute for a competency hearing because, while a report of a mental evaluation "is 'some evidence of [a defendant's] ability to assist in his defense,' . . . alone it is not dispositive of the issue." *Hollie*, 174 So. 3d at 832 (quoting *Pate*, 383 U.S. at 386). Of course, in this case, the report of the mental evaluation of Evans was not included in the appellate record.

76

¶140. As the majority acknowledges, the trial court expressed concern about Evans's mental health and mental competence to stand trial on several occasions during numerous pretrial hearings. Maj. Op. at ¶ 28. The majority bases much of its analysis on the fact that the trial court had the opportunity to observe and interact with Evans during those hearings. But, as noted by the trial court, Evans's conduct at the hearings provided cause for concern about his mental functioning. During the period before his mental evaluation, Evans filed motions to terminate his counsel. Evans's trial attorneys filed motions to withdraw from their representation of Evans. At one pretrial hearing, both Evans and his attorneys withdrew the motions, and Evans explained that his real complaint was inadequate medical care. Thus, Evans, facing the ultimate penalty of death, had been willing to gamble with his defense in order to secure what he perceived to be needed medical treatment.[19] Evans also had filed a flurry of rambling *pro se* motions complaining about deficient medical and mental health care at the jail. At one pretrial hearing, he represented that he had sued one of his physicians and claimed that this doctor, in retaliation, had withheld treatment. His attorneys informed the trial court that Evans had been taking antipsychotic drugs prior to incarceration and that he needed a referral to a physician to prescribe those drugs. After that hearing, the trial court ordered that Evans receive a full medical evaluation at the jail to determine his physical and mental status and so that any necessary drugs, including antipsychotic drugs, could be prescribed. Certainly, the record established doubt about Evans's mental competence, doubt

---

[19] In this Court, Evans also filed a *pro se* motion for termination of appellate counsel, complaining that, due to racial bias, employees of the Mississippi Department of Corrections had denied him medical care and caused him to suffer poor living conditions. On November 18, 2016, this Court denied the motion.

that should have been resolved by a competency hearing and an on-the-record adjudication of Evans's competency to stand trial, or lack thereof.

¶141. The majority finds that "the trial court was assiduously vigilant to ensure Evans's competence to stand trial was protected." Maj. Op. at ¶ 33. With respect, I submit that a minimally vigilant effort to protect Evans's right not to be tried while incompetent would have included what our rules prescribe when a mental evaluation for competency has been ordered: a competency hearing followed by an on-the-record adjudication respecting mental competence. *See* URCCC 9.06. The application of our heightened scrutiny standard of review for death penalty appeals, in which all doubts are resolved in favor of the accused, demands no less. *See **Moffett v. State***, 49 So. 3d 1073, 1079 (Miss. 2010) (quoting ***Loden v. State***, 971 So. 2d 548, 562 (Miss. 2007)). I would hold that, because the trial court had reasonable ground to believe Evans was mentally incompetent to stand trial, as demonstrated by its order for a mental evaluation to determine mental competence, the trial court was required to hold a competency hearing under Rule 9.06, weigh the evidence, and determine whether Evans was, in fact, mentally competent to stand trial. URCCC 9.06. Because no competency hearing and adjudication of mental competence occurred, in accordance with ***Hollie***, ***Smith***, ***Beasley***, ***Coleman***, ***Jay***, and ***Sanders***, I would reverse Evans's conviction and remand for a mental competency hearing to be followed by a new trial if Evans is found competent, or commitment of Evans to the Mississippi State Hospital or other appropriate mental health facility if he is found incompetent. *See **Hollie***, 174 So. 3d at 834.

> *B. The trial court erred by improperly and prejudicially limiting defense voir dire.*

¶142. This Court reviews the trial court's ruling limiting defense *voir dire* for abuse of discretion. ***Harris v. State***, 532 So. 2d 602, 607 (Miss. 1988). This Court has "held that counsel must have latitude in searching the minds and consciences of jurors in order to be able to exercise their peremptory challenges intelligently." ***Odom v. State***, 355 So. 2d 1381, 1383 (Miss. 1978); *see also* Miss. Code Ann. § 13-5-69 (Rev. 2012). But parties may not request pledges or promises from the venire or ask hypothetical questions requesting that the venire members return a certain verdict. ***Harris***, 532 So. 2d at 605-07; URCCC 3.05. Nonetheless, it is permissible for counsel to inquire of prospective jurors about their attitudes toward specific facts. ***Davis v. State***, 684 So. 2d 643, 651 (Miss. 1996) (this Court held that the prosecutor permissibly "questioned whether the venire could return a death penalty given certain facts, specifically, that the victim was killed by a friend, that Davis had no prior felony convictions, and that Davis was charged with one murder").

¶143. During *voir dire* examination, Evans's counsel asked whether any prospective jurors had "prior contact" with alcohol abuse themselves, or through family members. After twenty-four venire persons raised their hands, defense counsel asked whether anyone's ability to serve would be affected if evidence of alcohol use were involved in the case. All responded "no." Then, defense counsel asked whether any venire member would have a problem considering alcohol use as a mitigating circumstance in determining whether to impose either a death sentence or life without the possibility of parole, and also asked if the venire members could "use or consider an alcohol problem as a mitigating circumstance." After the State objected on the ground that the defense improperly had asked the venire for a

79

commitment, defense counsel rephrased the question and asked, "[i]f you can raise your hand if anyone could not use that as a mitigating circumstance[]." The trial court sustained the State's objection to that question on the same ground.

¶144. Evans points to the fact that both his guilt phase and penalty phase defense theories were premised on his lifelong history of alcohol abuse. He contends that the trial court improperly foreclosed his counsel's questioning of the venire to ascertain whether any venire members would not be able to consider alcohol abuse as mitigating, prejudicing his defense.

¶145. I agree with the majority's finding that the trial court properly sustained the State's objection to Evans's asking "can everyone use or consider an alcohol problem as a mitigating circumstance." That question ran afoul of the rule barring defense counsel from asking venire members to pledge to consider certain evidence as mitigating, especially in light of counsel's inclusion of the verb "use" in his question. But when Evans rephrased the question, he asked whether any individual venire member *could not* use an alcohol problem as mitigating. Specifically, he asked "[i]f you can raise your hand if anyone could not use that as a mitigating circumstance[]." With this question, Evans was inquiring whether any member of the venire, if the evidence showed an alcohol problem, would be unable or unwilling to use such evidence as mitigating.

¶146. The majority finds that this question sought to elicit a pledge from the venire. However, the question fell short of asking the venire to pledge to use evidence of an alcohol problem as a mitigating circumstance. Defense counsel simply asked if any venire member could not use such evidence as mitigating. And defense counsel was entitled to know

80

whether any venire member would be unable to use certain evidence as mitigating. In a death penalty case, under the Eighth Amendment, the sentencer must be permitted to "consider and give effect" to the defendant's presentation of mitigating evidence. *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). "[T]he sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime." *Id.*[20] It was perfectly appropriate for defense counsel to inquire whether any venire member would be unable to use, or "give effect," to Evans's presentation of his mitigating evidence of alcohol abuse.

¶147. I would hold that the trial court abused its discretion by sustaining the State's objection to Evans's question. And the improper limitation of defense *voir dire* prejudiced Evans because he was barred from identifying jurors unfavorably inclined to give effect to his primary mitigating evidence. I believe that this error demands a new trial.

> C. The trial court committed reversible error by seating an alternate juror in the sentencing phase.

¶148. After the guilt phase deliberations had concluded and the guilty verdict returned, the trial court excused one of the jurors due to a family emergency. The trial court replaced the juror with an alternate who had sat with the jurors throughout the trial but had not participated in guilt phase deliberations. This juror participated in the sentencing phase

---

[20] Although *Penry* involved jury instructions worded to prevent jurors from giving effect to the defendant's mitigating evidence, it indicates that barring defense counsel from identifying potential jurors who would refuse to consider the defendant's mitigating evidence as such has constitutional implications.

deliberations that resulted in the imposition of the death penalty. Evans argues that the seating of the alternate juror violated Mississippi's capital sentencing scheme. I agree.

¶149. Our statutory capital sentencing scheme provides that:

> (1) Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty.

Miss. Code Ann. § 99-19-101(1) (Rev. 2015). The seating of alternate jurors is governed by Mississippi Code Section 13-5-67, which provides that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties . . . . An alternate juror who does not replace a regular juror shall be discharged at the time the jury retires to consider its verdict." Miss. Code Ann. § 13-5-67 (Rev. 2012). The substitution of an alternate juror must be accomplished before the jury retires for deliberations, and it is improper to substitute an alternate juror during deliberations. *Balfour v. State*, 598 So. 2d 731, 753-54 (Miss. 1992).

¶150. In this case, the substitution of an alternate juror occurred after the completion of guilt phase deliberations, but before the commencement of sentencing phase deliberations. Thus, the newly seated alternate juror lacked the benefit of having participated in the guilt phase deliberations, a characteristic shared by the other eleven sentencing phase jurors. Our capital sentencing statute clearly provides that "[i]f, through impossibility or inability, the trial jury

is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty." Miss. Code Ann. § 99-19-101(1) (Rev. 2015). When the trial court, after guilt phase deliberations, excused one juror due to a family emergency, that ruling resulted in the inability of the jury that had convicted Evans of capital murder to reconvene for the sentencing phase. In those circumstances, Section 99-19-101 left the trial court no choice but to summon another jury to determine the penalty. Miss. Code Ann. § 99-19-101(1) (Rev. 2015). The trial court's seating of an alternate juror for the sentencing phase who had not participated in guilt phase deliberations with the other eleven jurors tainted the sentencing phase jury and violated Section 99-19-101. And the trial court's failure to adhere to the clear edict of Section 99-19-101 violated Evans's rights to due process of law under the state and federal constitutions. U.S. Const. amend. XIV; Miss. Const. art. 3, § 14. This error requires that Evans's death sentence be vacated.

### D. Conclusion

¶151. I vehemently disagree with this Court's decision to dispense with our precedent that carefully safeguards the requirement of Rule 9.06 of the Uniform Rules of Circuit and County Court Practice that, once the trial court has ordered a mental evaluation, a competency hearing and competency determination are mandatory. This Court affirms Evans's sentence to suffer death, the ultimate penalty, in the absence of any fully informed, focused inquiry into the question of his mental competence. I would reverse and remand for a new trial due to the trial court's failure to hold a competency hearing, followed by an on-

the-record determination of mental competence, as required by Rule 9.06. Further, I would find that reversible error occurred when the trial court improperly and prejudicially limited defense *voir dire*. Additionally, I would hold that the seating of an alternate juror in the sentencing phase, who had not participated in guilt phase deliberations, violated Section 99-19-101, requiring vacation of the death sentence.

**DICKINSON, P.J., AND KING, J., JOIN THIS OPINION.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*James Cobb Hutto III v. State*, 2014-DP-00177-SCT, 2017 WL 2001157 (Miss. May 11, 2017).

*David Cox v. State*, 183 So. 3d 36 (Miss. 2015).

*David Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

*Timothy Robert Ronk v. State*, 172 So. 3d 1112 (Miss. 2015).

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014). *following remand.

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), *leave to seek PCR granted in part and denied in part* (Feb. 2, 2017), *rehearing denied* (May 11, 2017).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So 3d 808 (Miss. 2013), *granted leave to seek PCR* (Jan. 21, 2016).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State*, 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005), *granted leave to seek second PCR*, 2013-DR-00327-SCT (Feb. 23, 2016).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*, 787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Bell v. State*, 725 So. 2d 836 (Miss. 1998), *post-conviction relief granted in part and denied in part*, 725 So. 2d 836 (Miss. 2011).

*Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*****Shell v. State**, 554 So. 2d 887 (Miss. 1989); **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding; **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*****Pinkney v. State**, 538 So. 2d 329 (Miss. 1989); **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding; **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*****Clemons v. State**, 535 So. 2d 1354 (Miss. 1988); **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding; **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987); **Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding; **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Erik Wayne Hollie v. State*, 174 So. 3d 824 (Miss. 2015).

*Manning v. State*, 158 So. 3d 302 (Miss. 2015) (reversing denial of post-conviction relief).

*Byrom v. State*, 2014-DR-00230-SCT (April 3, 2014) (order).

*Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Flowers v. State*, 842 So. 2d 531 (Miss. 2003).

*Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Bell v. State*, 160 So. 3d 188 (Miss. 2016).

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# <u>ON SENTENCING PHASE ONLY</u>


*Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*King v. State*, 784 So. 2d 884 (Miss. 2001).

*Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*West v. State*, 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd,* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *cert. denied, Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.